STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
HERBERT JAMES DALEY, DEFENDANT-APPELLANT.

Argued April 13, 1965—Decided June 14, 1965.

*Mr. Joseph I. Bedell,* attorney, argued the cause for appellant (*Mr. Irving M. Hirsh,* of counsel, on the brief).

*Mr. Leslie P. Glick,* Assistant Prosecutor of Union County, argued the cause for respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney; *Mr. Glick,* of counsel, on the brief).

The opinion of the court was delivered by

SCHETTINO, J. Defendant, Herbert Daley, was tried and convicted of murder in the second degree. His appeal to this Court followed as a matter of right. *R. R.* 1:2–1(c).

On September 2, 1963 at approximately 6:30 A.M. the body of Lillian Oskutis was found in a parking lot behind Patty's Beauty Shop at 255 Morris Avenue, Elizabeth. She was lying on her back with her legs spread apart about a foot and one-half, her dress and slip were pulled up above her hips and her underpants were torn off and lying on one leg. The inside of each thigh was bruised, her eyes were swollen shut and her face was covered with blood. There was a pool of blood on the ground beneath her head and the objects in the immediate area were blood splattered. Death occurred about 5 A.M. as a result primarily of blood clots on each side of the surface of the brain resulting from one or more blows to the head.

From all the testimony the following facts can be deduced. At approximately 7 P.M. on the preceding evening defendant had entered Woody's Tap Room at 40 West Grand Street,

Elizabeth. He and a companion, Thomas White, sat drinking until sometime after midnight. Daley and another patron started a fight when Daley grabbed the arm of the patron's woman companion. Daley, as a result of the fight, received an injured eye and scratched face, neither of which bled.

Defendant and White left as the result of the fight. They went to a tavern where they were turned away by the proprietor. At that very moment Lillian Oskutis, who had left the 1220 Club at about 12:40 A.M. after having been in there drinking for some time, walked past. They followed her down the street and Daley approached her. Defendant had known her for a period of five or six years and had given her $1 cab fare on the previous evening. On this occasion, she asked defendant for $20. When he refused to give her the money, she started screaming, at which point Daley forced her into the parking lot, slapped and kicked her and finally knocked her down. Daley left her as White approached. White saw her lying on the ground, her skirt pulled up to her hips. He heard her snoring, and she was, to him, apparently unhurt.

White returned to Woody's Tap Room and remained there until approximately 2 A.M. before returning to the parking lot. The victim was still in the same position and condition and snoring. He noticed, however, that the contents of her pocketbook were strewn on the ground and so he stopped, replaced the contents, and placed the pocketbook next to her.

Defendant, meanwhile, had gone to the Penn Diner and then returned to the parking lot where he saw White. Defendant apparently waited until White left before approaching her. He felt her pulse, she began to kick him and he reacted by slapping her and left. Upon again returning, he attempted to pick her up. This time the victim started to bite as well as kick him. He thereupon dropped her back onto the pavement. Daley returned to the Penn Diner where he removed his shirt upon which there was blood and cleaned up.

At approximately 10 P.M. the next night White was arrested. Within an hour Daley was arrested and was then

photographed, examined by a doctor and questioned concerning the murder. At 2:30–3:00 A.M. the police confronted him with White who identified him as the man he had said dragged the decedent into the parking lot. Defendant thereafter agreed to make a statement. The statement was transcribed and at 5:30 A.M. Daley signed it.

Defendant's statement in summary contained the following. He had known Miss Oskutis as a friend. On September 1, 1963 while drinking at Woody's Tap Room, defendant got into a fight with another man. This other man stuck a finger in defendant's eye. After the fight defendant and White left the Tap Room, went to another tavern for a drink or two and left this tavern. While walking on Morris Avenue, he was called by Miss Oskutis who asked him for $20. When he told her that he did not have that much money, she cursed at him, called him filthy names and struck at him. He got mad and pushed her into an alley. When she continued to push him, he slapped her, she fell, kicked at him a couple of times and he thereupon slapped her again. He also said that he became so angry that he kicked her—but did not remember how many times. He left and at that moment she was on the ground. He and White returned to the Tap Room and had a couple of beers. He then went to a diner, had a cup of coffee and returned to where he had left Miss Oskutis.

When he got there, he saw White near her. Defendant felt her wrist and pulse and noticed that she was breathing. He wanted to get her to a hospital but was too drunk to lift her. When he tried to pick her up, she slapped at him and kicked his legs. He thereupon slapped her but did not recall whether he kicked her. He noticed a pool of blood near her head. He got some blood on his clothing as the result of trying to pick her up. White and he then left.

He returned a third time. The statement is not clear as to whether he hit or kicked her on this visit. But defendant did say that when he had her part way off the ground, she fought and kicked him and he dropped her to the ground and slapped her. He noticed on this occasion that she was on her back,

face up, her legs were together and her dress or slip was pulled down and not up. Afterwards he returned to the diner, washed up and went home.

The next morning he was brought before the municipal magistrate. He thereafter signed a form paper consenting to a search of his room by the police.

The written statement, *i.e.*, the alleged confession, was held inadmissible by the trial court because defendant had signed it without its having been read by or to him. The court, however, did permit the police officers who were present to testify as to defendant's oral statements which had been taken down and transcribed after first deciding that such statements were voluntarily made.

Defendant contends that the trial court erred in admitting his oral statements. The court's finding of voluntariness is attacked on the basis of evidence of defendant's alleged physical and mental condition and of the physical and mental coercion allegedly imposed on him.

Daley testified that he was subjected to threats of force and that one officer placed a telephone book on his head and threatened to hit him with it. Additionally he testified to having been hit twice on his bad arm and to having been poked in the eye. He further testified to having been handcuffed to a chair and that this caused him severe pain. On cross-examination, he admitted having stated at the preliminary hearing on his motion to suppress that "the only thing they done was twist my arm when they took me out of the tavern."

Defendant submitted testimony of his low mentality to show that he was incapable of understanding the meaning and effect of a confession.

The State's testimony was as follows. The period encompassing Daley's arrival at police headquarters after his arrest to the start of his statement was, at most, only four hours. Of these four hours, no more than two and one-half were spent in interrogation. Daley was photographed and underwent a medical examination. Before confronting White, he

ate a sandwich, drank two or three cups of coffee and went to the bathroom.

The doctor who examined him before the oral statements were given testified that neither the injury to defendant's eye nor the facial abrasions which he had received the previous night was serious; that these injuries did not require immediate medical attention; and that neither was of a painful type or would cause more than mere discomfort or irritation. Daley complained to the doctor only of the irritation of his eye.

Daley's testimony that he suffered pain while handcuffed to a chair because of previous injuries to his arm and back was contradicted by the police officers who were present. They testified that Daley's complaints were limited to the annoyance caused by his irritated eye. There was thus conflicting evidence of the alleged physical violence and psychological pressure before the trial court. It believed the police officers and disbelieved the defendant. Moreover, at most the testimony concerning defendant's mentality was that defendant was below normal intelligence, not that he did not understand. The trial court's finding of voluntariness was properly grounded and we find no reason to disturb it on appeal.

Defendant next contends that his statement, made without advice of counsel, is inadmissible under *Escobedo v. State of Illinois*, 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964). The facts herein differ substantially from those in *Escobedo*. Daley admitted that he was advised of his right to remain silent and that he initially responded that he would refuse to answer any questions. As to defendant's request for counsel a conflict exists between defendant's testimony and that of the police officers. The trial court, under the then existing procedure utilizing a request and denial of counsel as a factor in determining voluntariness "resolved the question of credibility in favor of the state's witnesses" on this point. *State v. Grillo*, 11 *N. J.* 173 (1952), *cert.* denied 345 *U. S.* 976, 73 *S. Ct.* 1123, 97 *L. Ed.* 1391 (1953). The issue

being one of credibility, there is no reason for us to reject that testimony found credible by the trial court.

■ Defendant, recognizing the thrust of the foregoing, argues that we should depart from the requirement that the defendant request counsel, citing *People v. Dorado*, 40 *Cal. Rptr.* 264, 394 *P. 2d* 952 (*Sup. Ct.* 1964), affirmed on rehearing 42 *Cal. Rptr.* 169, 398 *P. 2d* 361 (*Sup. Ct.* 1965), cert. denied 85 *S. Ct.* 1765 (June 1, 1965). We have previously stated that we will not consider *Escobedo* applicable to facts such as those in the instant case. *State v. Lanzo*, 44 *N. J.* 560 (filed June 1, 1965); *State v. Bindhammer*, 44 *N. J.* 372 (1965); *State v. Blanchard*, 44 *N. J.* 195 (1965); *State v. Hodgson*, 44 *N. J.* 151 (1965); *State v. Vigliano*, 43 *N. J.* 44 (1964); *State v. Smith*, 43 *N. J.* 67 (1964), cert. denied 379 *U. S.* 1005, 85 *S. Ct.* 731, 13 *L. Ed. 2d* 706 (1965).

Prior to trial defendant moved to suppress certain articles of clothing taken from his room. The trial court deferred decision in order to permit the introduction of additional evidence at trial. Ultimately, the court admitted the evidence.

Defendant was placed in a cell at approximately 5:30 A.M. Defendant testified that he was unable to sleep because his eye was running and his back was bothering him lying on the hard cot. At 9:30 A.M. he was brought before the municipal magistrate who advised Daley of his rights and continued the hearing until a later date in order to permit Daley to obtain counsel. Daley was then photographed and returned to his cell.

Elizabeth police detectives testified that they went to Daley's cell soon after the hearing (11:00 A.M.) and asked him what clothes he was wearing at the time of the murder. Daley answered that the shirt he was wearing was in his room and he did not recall which pair of trousers he was wearing because he had five or six similar pairs. He was asked if they could go to his room and get the shirt and trousers. Defendant, according to these officers responded: "Go ahead up there, the door is open. I never lock it." Daley was then

brought upstairs where a written consent form was prepared. The completed form was given to Daley to read. The detectives testified that Daley began to read it but indicated he was unable to do so because of his eye. One of the officers took the form and read it to Daley. Daley was then taken before another detective who was a notary public. This officer testified that he asked Daley whether he had read the form, Daley said "no" but that one of the detectives had read it to him, that he asked defendant if he understood what it was and although the defendant answered that he did, the officer once again explained that it was an authorization to search his room. He then told the defendant that he did not have to sign it if he did not want to but the defendant had said that he would sign it. Defendant thereafter signed his name and address on the form.[1] One of the detectives testified that he, too, repeated to Daley that defendant had just given his permission to search his room to which Daley responded that he knew he had given such permission.

Daley testified that he neither read the form nor had it explained to him. He stated that he was told to sign it and did so upon a threat of force by a certain detective. At a later point in his testimony, however, he testified that he was not even certain if that particular detective was in the room when he signed the statement. Moreover, defendant testified that the detective who notarized the form told him "You don't need to sign it."

---

[1] The following was read to and signed by Daley:

"I, Herbert Daley, having been informed of my Constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Detectives Timothy Lynes and F. Schlauch, members of the Elizabeth Police Homicide Squad to conduct a complete search of my residence located at Room at third floor, rear of 136 Grand Street, my possessions and/or other properties that I own, rent, use or control. These Detectives are authorized by me to take from my custody any letters, papers, materials or other property which are pertinent to the matter under investigation. This written permission is being given by me to the above named Elizabeth Detectives voluntarily and without threats or promises of any kind."

76

As pointed out by Mr. Justice Jacobs in *State v. Bindhammer*, 44 *N. J.* 372, 380–381 (1965):

"It is clear that when a search has been validly consented to, it may lawfully be made without a search warrant. See *United States v. Page*, 302 *F.* 2d 81 (9 *Cir.* 1962). The consent may be given while in custody, although here the State has a heavier burden of establishing that such consent was given freely, understandingly and unequivocally. See *United States v. Page, supra*, 302 *F.* 2d, at *p.* 83; *cf. Judd v. United States*, 89 *U. S. App. D. C.* 64, 190 *F.* 2d 649 [*D. C. Cir.*] (1951). The particular facts in each case will be determinative and while a court will critically view a consent by one in custody who has made no confession, it will more readily accept a consent by a confessing defendant who has told where the incriminating evidence is hidden. See *United States v. Smith, supra* [2 *Cir..*], 308 *F.* 2d 657; *cf. United States v. Mitchell*, 322 *U. S.* 65, 64 *S. Ct.* 896, 88 *L. Ed.* 1140 (1944). * * *"

██ From all the testimony the trial court could have found that here the defendant had already confessed, that he had consented orally to the search, that he was informed of his right not to sign the form and that his testimony going to coercion was self-contradictory. Moreover, the existence of a written waiver points strongly to the fact that the waiver was specific and intelligently made. See *Davis, Federal Searches and Seizures*, § 4.41 (1964). We are satisfied that the findings of the trial court both underlying and ultimate were correct.

██ Defendant lastly contends that the verdict was against the weight of the evidence. We will not set aside a jury verdict as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion. *R. R.* 1:5–1(a). Such is not the case here.

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.