**UNITED STATES of America ex rel. Herbert James DALEY, Appellant,**

v.

**Howard D. YEAGER, Warden, New Jersey State Prison, Trenton, New Jersey.**

**No. 17031.**

United States Court of Appeals Third Circuit.

Submitted on Briefs Sept. 26, 1968.

Argued May 1, 1969.

Decided Aug. 11, 1969.

Ralph S. Spritzer, Philadelphia, Pa., for appellant.

Leslie P. Glick, Asst. Prosecutor, Elizabeth, N. J. (Leo Kaplowitz, Union County Prosecutor, Elizabeth, N. J., on the brief), for appellee.

Before BIGGS, FREEDMAN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal challenges a District Court order denying a petition for a writ of habeas corpus. Relator (age 41 in 1963) was tried by a jury in the Superior Court of New Jersey, Union County, in April 1964 on a charge of murder. He was found guilty of murder in the second degree and sentenced on May 14, 1964, to a term of 20 to 24 years' imprisonment. On appeal to the Supreme Court of New Jersey, relator contended, inter alia, that the trial court should have excluded his oral admissions (recounted by police officers who had interrogated him) and suppressed evidence obtained by the police from his dwelling following his execution of a consent to search. Both the admissions and the consent, he urged, were involuntary and obtained in violation of his constitutional rights. The judgment of conviction and sentence were affirmed by the Supreme Court of New Jersey. State v. Daley, 45 N. J. 68, 211 A.2d 354 (1965), cert. den. 384 U. S. 1022, 86 S. Ct. 1934, 16 L.Ed.2d 1023 (1966).

The victim, Lillian Oskutis, was found on a parking lot in Elizabeth, New Jersey, at about 6:30 A.M. on September 2, 1963. Her body showed marks of blood and violence, and she had been dead, according to the examining physician, for approximately two hours. Post-mortem examination revealed that she had been intoxicated and that death had been caused by blood clots resulting from injuries to the head.

Relator, it appears, had a casual acquaintanceship with the victim. Both regularly frequented the neighborhood taverns and relator had seen her "around." According to White, relator's companion during portions of the night of September 1–2 and the State's principal witness, Miss Oskutis walked past a certain tavern (having recently departed from another bar) shortly after midnight.[1] Daley was standing outside the tavern and a brief conversation between him and Miss Oskutis ensued. Miss Oskutis became abusive and shouted profanely at Daley. Thereafter, according to White, Daley grabbed the victim and forcibly pushed her into the parking lot where she was ultimately found.

None of the State's witnesses, other than White, testified to having seen an assault upon the victim. The State did offer testimony that Daley had blood on his shirt in the early morning hours of September 2 when seen going to and from a diner. It also appeared that Daley had been drinking steadily on September 1; that he was involved in a barroom scuffle with one Roy that night; and that as a result he had suffered an eye injury or gash. The state also offered evidence that Daley's eye had not bled or had not bled sufficiently to account for the blood on his shirt.[2]

The testimony indicates that Daley slept until afternoon on Sunday, September 1, and that he did not return home until about 5 A. M. Monday morning (September 2). He was back in circulation—at a local tavern—by 8:30 A. M. on September 2, and he did not sleep

---

1. White indicated that he too was only casually acquainted with the victim, although it appears that they lived in the same rooming house.

2. One State's witness described the eye injury as a "very, very deep gash" and another of the State's witnesses testified that Daley's "face was all beaten up and his eye was pretty bad."

again until after his arrest and interrogation, but he did lie down in an effort to sleep between about 11:30 A. M. and 2 P. M. Under such circumstances, he had had virtually no sleep (perhaps from 5 A. M. to 8:15 A. M. on September 2) from the afternoon of September 1 until the time he executed the consent to the search at about 11 A. M. on September 3 (a period of over 40 hours).

There is testimony that relator had a mental age of 11 in 1956 and of 10 in late 1963, according to tests given in those years. In 1956, Daley was admitted to the Marlboro State Hospital, a mental institution, for a period of 60 days. The hospital's director stated that the diagnosis had been "schizophrenic reaction simple type" and the prognosis "poor". He testified that a mental condition such as Daley had would be characterized by a greater degree of suggestibility and that such a person's tolerance and will to resist would be lower in stressful situations.[3] The trial judge recited that "the defense offered considerable testimony as to the mental capacities or incapacities of the defendant"[4] which made it "apparent to the Court that the defendant was unable to read and was able to write merely his name and perhaps his address."

The balance of the case against Daley comes from two sources: (1) testimony by police officers as to admissions allegedly made by Daley while he was interrogated between 11:30 P. M. on September 2 and 5:30 A. M. on September 3;[5]

---

3. This doctor testified at N.T. 953:

"This man, as I indicated, is a simple schizophrenic with a dull normal to high moron intelligence. His ability to take harassment, distress, difficulty, solve problems, even simple problems, is very limited. * * * So in a stressful situation his tolerance would probably be lower than that of a normal person and to that degree his critical discernment to his judgment and will to resist would be impaired. That is not to say it would be totally impaired, but it would be relatively less than that of a normal person."

4. This language and the wording at R. 27a that "the oral statements * * * were the result of the free and unconstrained choice of the defendant and not as a result of the overbearing of his will by mental * * * coercion" negative the contention of counsel for relator (page 14 of Supplemental Brief) that the trial judge's determination of voluntariness (see page 10 below) contained "no reference to the mental condition or capacity of the accused." Also, the trial judge showed his consideration of the relator's mental capacity by his instructions to the jury on April 24, when he announced to it that the court "has decided to permit testimony concerning any alleged oral statements of the defendant allegedly made to certain police officers during the morning of September 3, 1963." At that time he said:

"It is your obligation to decide whether or not any of these alleged oral statements of the defendant were voluntary or involuntary and if you decide that any such alleged oral statement was involuntary you must disregard it or them entirely.

"Now, in the course of presenting evidence in your presence to aid you in making a determination as to whether any alleged statement of the defendant was voluntary or involuntary, the defense has presented considerable testimony in evidence relating to the defendant's early childhood, his schooling and life in general, including his employment and work record, his school record, and testimony both lay and expert concerning his *mental capacity or mental incapacity*. This evidence is relevant and evidential. Not only in your *determination of the issue of voluntariness or involuntariness of any alleged oral statement, but is also evidential and probative in several other respects in the case." [Emphasis supplied]

5. A summary of the admissions of Daley appears in State v. Daley, *supra*, at pp. 355–356 of 211 A.2d.

Daley testified, after his oral admissions had been read into evidence, that White proceeded to carry the victim, over his shoulder, into the parking lot; that he (Daley) told White "to leave her alone"; that he and White left the lot— at which point the victim was "all right" and that he returned later; that, when he returned, Miss Oskutis was lying in a different position, her dress was "up in the air" and her head was bleeding; that White was on the scene, standing above Miss Oskutis and "between her legs"; that he (Daley) attempted to help the victim by lifting her up and that he got blood on his shirt.

(2) proof that clothing seized at Daley's dwelling pursuant to the consent to search was bloodstained, and that the blood on such clothing, as well as on his shoes (see page 784 below), corresponded to the victim's blood type and not to Daley's.

During the trial, the trial judge concluded, in a statement from the bench, after a hearing conducted in the presence of the jury, that the oral admissions of Daley were voluntarily given, and that he consented "freely and intelligently" to the search of his room and the seizure of his clothing, thereby waiving his Fourth Amendment rights. In these bench statements, the trial judge found that the relator arrived at Police Headquarters at 11:30 P. M. on September 2, 1963, and was permitted to go to the men's lavatory. His left wrist was then handcuffed to a chair in the office of Detective Captain Brugger and his shoes, which had blood on them, were removed. After an examination by the police physician lasting about one hour, he "was found by the physician [to be suffering from an injury to his left eye and] to have numerous other abrasions and contused areas about his body. * * * [H]e did not in any respect require immediate medical attention. * * * if any pain was suffered, it was very slight, not severe, that the condition of the left eye was merely a matter of irritation and it was not severe." The defendant "was furnished with coffee [and sandwiches at times], permitted to smoke cigarettes whenever he desired".

"Preceding the beginning of the so-called written transcript of the defendant's remarks, the defendant was also taken from Captain Brugger's office on one occasion to confront or be confronted with a material witness named Thomas White and this occurred sometime between 2:15 a. m. and 3 a. m. on the morning of September 3, 1963. After this confrontment, the defendant was returned to the office of Detective Captain Brugger and the interrogation continued. It was only a short time after the confrontation that, as Captain Brugger testified, the defendant stated, 'I did it, I will give you a statement.'"

"[T]he defendant exhibited a desire to wait until the morning to give his statement * * *."

"* * * subsequent to 5:45 a. m. on the morning of September 3, 1963 * * * the defendant was taken from the Detective Bureau on the third floor of Elizabeth Police Headquarters to a cell on a lower floor of that building. He was placed in and remained in said cell from approximately 5:45 a. m. until approximately 9:30 a. m.

"The defendant testifies that he was unable to sleep while in the cell for that period of some three hours and forty-five minutes because, and it is a fact, his eye was, in his language, 'running and running and running.' In addition he complained that his back bothered him and the hardness of the sleeping facilities in the cell made it impossible for him to sleep during that period. This is not corroborated by any other witness but it is not contradicted by any witness.

"The defendant was removed from the cell at approximately 9:30 a. m. and apparently afforded a preliminary hearing by the municipal magistrate of the City of Elizabeth. In the course of the preliminary hearing the defendant was advised of his right to counsel to assist him, and in response to questions by the court, indicated a desire to obtain counsel. The magistrate, accordingly, continued the hearing until a later date and the defendant was * * * taken to * * * his cell in the lower portion of the Elizabeth Police Headquarters and remained there doing, I know not what, until approximately 11 a. m. * * * Detectives Schlauch and Lynes of the Elizabeth Police Department went to the cell of the defendant and, in the language of Detective Schlauch, the defendant was asked

what clothes he was wearing on the night of September 1st and the early morning of September 2nd, 1963. The defendant said that the shirt he was wearing was in his room and he did not recall which pair of trousers he was wearing because he has five or six pairs that look almost alike. He was then asked by Detective Schlauch whether the detective could look in his room or go to his room and get the shirt and trousers that he was wearing on the night of September 1st, the morning of September 2nd, 1963. The defendant, according to Detective Schlauch, responded by saying, 'Go ahead up there, the door is open. I never lock it.' The defendant was then advised that the detectives, nevertheless would like to have him execute a written consent to go to his room and there obtain the clothing that he was wearing on the night of September 1st or the early morning hours of September 2nd, 1963. The defendant was then taken to an upper room, I believe in the Detective Bureau again, where a written form of consent was prepared by Detective Schlauch."

The consent form was read to relator, who "was told * * * that he didn't have to sign it if he didn't want to. The defendant responded, 'I will sign it.' The defendant thereafter signed the written consent. * * *"

"The Court believes that despite the fact the defendant in the language of the police officers, appeared nervous and his hand was shaking, was possessed of sufficient mental capacity and physical capacity to make a free and unequivocal and intelligent consent to the search of his room by the Elizabeth police officers.

\* \* \* \* \* \*

"The Court finds that the consent, as stated, was freely and intelligently given. Accordingly, the motion to suppress will be denied."

After a careful consideration of this record, we have concluded that the relator's rights under the Fourth, Fifth and Sixth Amendments were denied since "right after" the preliminary hearing on the complaint of murder, at which he requested the assistance of a lawyer and which hearing was adjourned "until such time as he would have an attorney,"[6] the detectives (fully aware of his request for counsel) secured from him a consent to search his apartment and seized his blood-stained clothes, which were received in evidence at the trial in spite of a timely motion to suppress this evidence. See White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Massiah v. United States, 377 U.S. 201, 204–207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[7] Once the prosecution has commenced, law enforcement officers may not secure concessions from an accused which circumvent the protections a lawyer might provide. Cf. Escobedo v. Illinois, 378 U.S. 478, at pp. 485–488, 84 S.Ct. 1758 at pp. 1762, 1764,

6. New Jersey Criminal Practice Rule 3:2–3 provides in part:
"(b) Preliminary Hearing. The magistrate shall inform the defendant of the complaint against him and if a copy of the complaint has not previously been furnished to the defendant, he shall be supplied with a copy thereof. The magistrate shall also inform the defendant of his right to retain counsel or, if indigent, of the privilege of having counsel assigned, and of his right to have a preliminary examination. The magistrate shall allow the defendant reasonable time and opportunity to consult counsel * * *."

7. As stated in People v. Rodriguez, 11 N.Y.2d 279, 229 N.Y.S.2d 353, 183 N.E. 2d 651 (1962), cited with approval in *Massiah, supra*, 377 U.S. at 205 (footnote 5), 84 S.Ct. 1199,
"[I]t matters not that defendant gave his statement before indictment. It is the interrogation, in the absence of counsel, after the criminal proceeding has been commenced, whether by grand jury indictment or by a charge placed before a magistrate following an arrest, which is forbidden."
In United States ex rel. O'Connor v. State of New Jersey, 405 F.2d 632 (3rd Cir. 1969), we held that *Massiah* applies to state prosecutions pending direct appeal on and after May 18, 1964.

12 L.Ed.2d 977 (1964),[8] where the court said:

"The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested * * an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of 'an unsolved crime.' * * * The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation. Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158. This was the 'stage when legal aid and advice' were most critical to petitioner. Massiah v. United States, *supra,* 377 U.S. at 204, 84 S.Ct. 1199. It was a stage surely as critical as was the arraignment in Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, and the preliminary hearing in White v. Maryland, 373 U. S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. What happened at this interrogation could certainly 'affect the whole trial,' Hamilton v. Alabama, *supra,* 368 U.S. at 54, 82 S.Ct. 157 since rights 'may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes.' *Ibid.* It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder.

\* \* \* \* \* \*

"There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege[s] * * *."[9]

The Circuit Courts of Appeals have held that where a judicial proceeding has been adjourned to enable the accused to secure counsel, the Sixth Amendment precludes securing confessions from the accused in the absence of counsel. Queen v. United States, 118 U.S.App.D. C. 262, 335 F.2d 297 (1964); Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964, 969–970 (1964). See, also, Clifton v. United States, 341 F.2d 649 (5th Cir. 1965).

In view of the absence of "overwhelming" untainted evidence for the prosecution here, see Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and of the weakened condition of relator from loss of sleep and his history of schizophrenia involving a tendency to suggestion and lack of critical discernment,[10] this record does not justify a finding that the deprivation of relator's constitutional right to a lawyer was harmless beyond a reasonable doubt.[11] See Chapman v. California, 386

8. We have not overlooked the rule that the *Escobedo* holding is inapplicable to this April 1964 trial. See Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *O'Connor, supra,* at footnote 7, p. 634 of 405 F.2d.

9. The court also said at page 490 of 378 U.S., at page 1764 of 84 S.Ct.:

"We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to *fear* that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system."

10. See page 781, *supra.*

11. Armed with the improperly obtained consent to search, the police proceeded to relator's dwelling and seized several articles of clothing, including a shirt and undershirt. These latter items, as well as the shoes which had been removed from

U.S. 18, 87 S.Ct. 824 (1967); *O'Connor, supra,* 405 F.2d at 638.

A careful review of the record shows that there is substantial evidence to fairly support the findings and conclusions of the state trial judge that the oral confession of relator made to the police officers about 3 A. M. on September 3 (see p. 6 above) was voluntary.[12] Under the standards in 28 U.S.C. § 2254(d), this determination after a hearing on the merits is "presumed to be correct." Pursuant to the June 2, 1969, opinion of the Supreme Court of the United States in Jenkins v. Delaware, 395 U.S. 213, 89 S.Ct. 1677, 23 L. Ed.2d 253, this oral confession received in evidence at the April 1964 trial will not be excludable, for failure to comply with the standards for determining admissibility of in custody statements set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the new trial required . because of the denial of relator's constitutional rights in receiving his clothing in evidence. We do not, of course, now determine whether the oral confession should be held admissible at the new trial, for we cannot now tell what evidence may be presented at that time on its voluntariness.

The order of the District Court will be reversed, with directions that an order be entered providing that a writ of habeas corpus shall be granted unless relator is granted, within a reasonable time, a new trial on terms not inconsistent with this opinion.

---

relator in the police station, were introduced into evidence at trial by the State. All bore bloodstains which, according to expert testimony, were Type O. The victim's blood type was also O; relator's was A. The State introduced testimony of witnesses who observed relator wearing a bloodstained shirt in the early morning hours of September 2, 1963, approximately the time the death of the victim occurred.

12. See R. 3a to 27a. In making his findings, the state trial judge showed by his language and his reliance on cases such as Rogers v. Richmond, 365 U.S. 534, 541 & 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), that his attention was "focused * * * on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined * * *"

(p. 544 of 365 U.S., p. 741 of 81 S.Ct.). See, generally, Developments in the Law —Confessions, 79 Harv.L.Rev. 935, 961– 984 (1966); cf. Haynes v. Washington, 373 U.S. 503, 513–515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Also, the trial judge "resolved the question of credibility [on issues such as whether relator requested counsel during the interrogation which included his oral confession] in favor of * * * the police witnesses [who stated] that the defendant never requested permission to communicate with * * * any * * * attorney * * *." In view of this finding, Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), would not render his oral confessions inadmissible in any event. See Billingsley v. State of New Jersey, 408 F.2d 1181, 1183 (3rd Cir. 1969); cf. Frazier v. Cupp, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L.Ed.2d 684 (1969).