**UNITED STATES of America,
Appellee,**

v.

**Charles MESSINA, Appellant.**

**No. 393, Docket 74–2066.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 1974.

Decided Dec. 10, 1974.

Certiorari Denied March 24, 1975.

See 95 S.Ct. 1433.

Steven J. Hyman, New York City (Samuel B. Mayer, New York City, of counsel), for appellant.

Ethan A. Levin-Epstein, Asst. U. S. Atty. (David G. Trager, U. S. Atty., E. D. N. Y., and Paul B. Bergman, Asst. U. S. Atty., of counsel), for appellee.

Before MEDINA, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

Forty-four cartons of men's Italian knit turtleneck sweaters, consigned by an Italian firm, DEPE, from Milan to Sue B. Fashions of New York City and valued at approximately $45,000, were stolen on November 25, 1973. On arrival at Lufthansa's facilities at John F. Kennedy Airport, the cartons had been loaded on a truck, belonging to Lance Airfreight Company, which was then driven back to and parked at Lance's loading dock at the U. S. Custom Service in Cargo Building 80 pending delivery later to the consignee. In the afternoon of November 25, a man appeared at the office of Bob's Towing Service, pursuant to previous telephone arrangement, to pay $35 for the towing of the truck and execute documents to authorize the towing; two employees, Robert Bavaro and Robert Schmeltz, engaged the man in brief conversations, the first ascertaining the nature of the towing job and the second filling out the necessary papers. The man identified himself as a mechanic for Lance Airfreight and explained that the truck parked at Lance's dock had to be towed to an American gasoline station in

Brooklyn for repair. A driver, Kenneth Mantione, picked up the truck and towed it, as instructed, to the gasoline station in Brooklyn. Arriving there about 9:00 p.m., he met a man who told him where to place the truck and assisted him in positioning it. Bavaro, Schmeltz, and Mantione subsequently made photographic identifications of defendant Messina as the man they had seen on November 25.

On the basis of these identifications FBI agent Jules and Port Authority Police Department detectives McKenna and Maiolo arrested Messina at his home pursuant to an arrest warrant on December 18, and Agent Jules advised him of his rights with respect to interrogation. They took him to the New York office of the FBI, where Agent Jules again advised him of his rights and he signed the FBI Advice of Rights form. The four men proceeded to the federal courthouse in the Eastern District of New York for Messina's arraignment. According to Agent Jules, while awaiting this, Messina, after saying he wasn't feeling well, stated he had nothing to do with the hijacking but wanted "to cooperate" and admitted he had been selling "some of these sweaters". He said he had had five, obtained from a person known as Vinnie at a social club in Brooklyn. He added that two were still at his home and "If you want these sweaters, you can have them."

The magistrate appointed the Legal Aid Society to represent Messina. Mr. Edward Kelly, a Legal Aid attorney, conferred with him. While he had no specific recollection of the events of December 18, Mr. Kelly testified that his practice was to advise clients not to make any statements to law enforcement officers without first consulting with counsel.

After Messina was released, Agent Jules informed Mr. Kelly not to worry about him since the agent was "going to drop him off at his home because he wasn't feeling well." Mr. Kelly made no comment but admitted in his testimony that he knew Jules was an FBI agent.

During the journey, Messina and Detective Maiolo "were talking about Italy and where who came from and what." Maiolo and Messina went up the stairs to the latter's apartment. Messina gave Maiolo "a small shot" of whiskey and instructed his wife "Go get the sweaters". She went into another room, came back and handed two sweaters to Messina, who gave them to Maiolo, saying "This is it, and I want to show you I am trying to help."

Bernard Ruderman, sales manager of Sue B. Fashions, later identified the sweaters as bearing his firm's "RN", a registered number assigned by the Federal Trade Commission under the Wool Products Labeling Act, 15 U.S.C. § 68, see 16 C.F.R. §§ 300.3(a)(3), 300.4, and testified that the sweaters were of the same type as those in the stolen shipment.

After trial before Judge Weinstein and a jury in the District Court for the Eastern District of New York, at which Bavaro, Schmeltz, and Mantione again identified him, Messina was convicted on two counts of stealing and of possessing the 44 cartons of sweaters in violation of 18 U.S.C. § 659.

█ Messina mounts a vigorous attack upon the identifications, on which Judge Weinstein had conducted an extensive suppression hearing. Without going into burdensome detail, it suffices to say that the pre-arrest identification procedures included the obtaining of descriptions from the three witnesses, selection by Schmeltz from a large collection maintained by the Port Authority of a number of photographs generally resembling the man who had appeared at the office, the making of composite drawings by Mantione and Bavaro, and positive identifications by all three men from a spread of seven photographs. After arraignment there was a lineup, attended by Messina's attorney, at which the three men, separately, chose Messina.

This case does not require us to add to the enormous literature on the application by this and other courts of the mandate in Simmons v. United States, 390

U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." With respect to two of the witnesses, Schmeltz and Mantione, the judge extracted statements at the suppression hearing that their identifications rested on their recollection of what they had seen in the office or at the gasoline station and not on what had happened in the interval. At the suppression hearing Bavaro was far less clear about this; at the trial he became more positive on the point and cross-examination on the basis of his earlier testimony failed to shake him. While one may indeed be skeptical over the ability of a witness thus to compartmentalize his memory, *see* United States v. Wade, 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that point would become important only if the intervening procedures were impermissibly suggestive; here they were not. Our examination of the record has convinced us that the agents took considerable pains to avoid any acts or procedures which would be unnecessarily suggestive and that, with exceptions we do not deem significant, they succeeded. We are impressed, among other things, by the efforts of the agents to keep the witnesses from influencing each other. The only possible instance of collaboration we can find in the record (and we have some doubt that there was any collaboration even here) was the effort of Mantione and Bavaro to make composite drawings, an enterprise in which, in contradistinction to selections from a book of photographs or a lineup, collaboration would serve the interests of accuracy. Mantione's concession, after extensive cross-examination at the suppression hearing, that "If this man was going to the gas chambers, I would say I wasn't positive", strikes us an earmark of an honest and careful witness rather than as evidence of serious doubt.

Putting aside for the moment the argument that the visit to Messina's home to obtain the sweaters subsequent to the arraignment violated Messina's rights under the Sixth Amendment, we see no merit in the contention that Judge Weinstein erred in finding that the agents did not violate Messina's Fourth Amendment rights. As he specifically found, Messina blurted out his offer to hand over the sweaters without the slightest suggestion from the agents. Compare United States v. Gaynor, 472 F.2d 899 (2 Cir. 1973); United States v. Duffy, 479 F.2d 1038 (2 Cir.), cert. denied, 414 U.S. 978, 94 S.Ct. 299, 38 L.Ed.2d 221 (1973); United States v. Kaylor, 491 F.2d 1127, 1131 (2 Cir. 1973). The agents were not obliged to interrupt Messina's voluntary statements and caution him again that what he said might be used against him. United States v. Gaynor, *supra*, 472 F.2d at 900. Indeed we do not believe that the agents' receipt of the sweaters was a search or seizure at all. There was no examination of Messina's apartment; Detective Maiolo simply took what Messina had chosen to give. The episode lacked the element of an "intrusion" essential to the existence of a "search" and consequently of a "seizure" in connection with a "search". See ALI, A Model Code of Pre-Arraignment Procedure § SS 210.-1(1) and (2) and Commentary at 160, Official Draft No. 1, July 15, 1972. *Cf.* Davis, Federal Searches and Seizures § 1.12 (1964); Ringel, Searches and Seizures, Arrests and Confessions § 167 (1972).

Somewhat more troubling at first blush is the claim that the failure of the agents to advise Messina's lawyer of their intention to collect the sweaters violated his Sixth Amendment right "to have the Assistance of Counsel for his defence." To be sure, Massiah v. United States, 377 U.S. 201, 207, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964), the cornerstone of Messina's argument, held only "that the defendant's own incriminating

statements, obtained by federal agents under the circumstances here disclosed [a post-indictment conversation between Massiah and a fellow conspirator who had decided to cooperate with the police and allowed a recording device to be installed in his automobile], could not constitutionally be used by the prosecution as evidence against *him* at his trial" (emphasis in original). But in United States v. Wade, *supra*, 388 U.S. at 226–227, 87 S.Ct. 1926, at 1932, the Court said that nothing decided or said in *Massiah* or other cases "links the right to counsel only to protection of Fifth Amendment rights," that "in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the procedure, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial," and that "[t]he presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution." Specifically the Court held that while the "analyzing of the accused's fingerprints, blood sample, clothing, hair and the like," apparently even after arraignment or indictment and the retention or appointment of counsel, were not "critical stages" demanding the presence of counsel, a different rule prevailed with respect to lineups—a principle later limited by Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), to lineups subsequent to a formal charge of a criminal offense. Except for the addition in Gilbert v. California, 388 U.S. 263, 267, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), decided along with *Wade*, that the taking of handwriting exemplars is not a "critical" stage of the criminal proceedings requiring the presence of counsel, the Court has not had further occasion to decide how far, if at all, *Massiah* extends beyond the taking of statements and lineups.

However, there are decisions of lower courts that, after a criminal prosecution has been commenced and counsel has been retained, appointed or requested, consent to a search given in the absence of counsel is invalid unless the record justifies a finding that the deprivation of the right was harmless beyond a reasonable doubt or, presumably, that the right to the assistance of counsel has been effectively waived. *See* United States ex rel. Daley v. Yeager, 415 F.2d 779, 783–784 (3 Cir. 1969), cert. denied, 397 U.S. 924, 90 S.Ct. 919, 25 L.Ed.2d 104 (1970); . *cf.* Tidwell v. Superior Court, 17 Cal.App.3d 780, 95 Cal.Rptr. 213 (1971). Assuming the correctness of these decisions, we do not think they call for reversal under the circumstances of this case. For one thing we do not believe, for the reason already stated, that here there was any search or seizure at all. If there was, Messina had given his consent before the criminal prosecution had begun and Sixth Amendment rights had attached under Kirby v. Illinois, *supra*, 406 U.S. at 690, 92 S.Ct. 1877, 32 L.Ed.2d 411. After that had happened, Messina had ample opportunity to tell his appointed counsel what he had offered. While there is no evidence that he did this, counsel's advice not to talk to the agents was sufficient to warn against other forms of cooperation with them; the agents were not bound to make sure that Messina had told his counsel the full story of what he had agreed to do. His decision to fulfill his offer was doubtless wise since a refusal would simply have led the agents to obtain a warrant for a thorough search of his home, for which the photographic identifications, the volunteered statement, and a refusal to fulfill the offer would have afforded ample basis. Judge Weinstein was thus quite justified in finding that Messina "did this very deliberately, because he thought that he would be able to place himself in a better position in the prosecution of his case, and that he might be able to get the sympathy and the protection of the FBI agents and Police personnel." Having decided, after receiving the advice of counsel, to go through with his own plan, which diverted the agents from obtaining a search warrant that was theirs for the asking and might

have led to their obtaining even more damaging evidence, Messina is in no position to complain of their failure to do this.

 We are not clear whether appellant's counsel makes an additional argument against admission of the sweaters on the ground of irrelevancy. If so, it is without merit. Messina's possession of the sweaters, produced by the very manufacturer for the very consignee who was the victim of the theft, and received at its approximate time, clearly made his participation "more probable . . . than it would be without the evidence." That is all that is needed. Proposed Federal Rules of Evidence, rule 401.

Affirmed.