268 N.J. Super. 378 (1993)
633 A.2d 1005
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SOLOMON CARPENTER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 1, 1993.
Decided November 24, 1993.
*379 Before Judges J.H. COLEMAN and LEVY.
Zulima V. Farber, Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender, of counsel and on the letter brief).
Clifford J. Minor, Essex County Prosecutor, attorney for respondent (Virginia M. Lincoln, Assistant Prosecutor, of counsel).
The opinion of the court was delivered by COLEMAN, P.J.A.D.
The significant issue raised in this appeal is whether defendant, who was twenty-two years old with an I.Q. of 71, waived his privilege against self-incrimination. The State had the heavy burden of demonstrating that such a waiver was made "voluntarily, knowingly, and intelligently." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966). We hold that the State sustained its burden beyond a reasonable doubt.
Following the denial of a motion to suppress confessions given by defendant, he entered conditional guilty pleas, see R. 3:9-3(f), to six third-degree burglaries, contrary to N.J.S.A. 2C:18-2. He was sentenced to concurrent custodial terms of four years on November 30, 1990. On October 28, 1991, we granted leave to file a notice of appeal nunc pro tunc. Defendant's appellate brief was filed January 29, 1993, approximately ten months after he had been paroled. Defendant contends in this appeal the State failed to sustain its burden of "proving that the mentally retarded defendant knowingly and intelligently waived his right against self-incrimination before he confessed."
It is important to note that the waiver issue raised in this appeal involves an entirely different analysis than that required when determining whether a suspect's right to remain silent was "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313, 320-21 (1975); State v. Hartley, 103 N.J. 252, 261-67, 511 A.2d 80 (1986). The waiver analysis is *380 based upon requirements of the Fifth Amendment privilege against self-incrimination, made applicable to the states through the Fourteenth Amendment, and New Jersey's common law privilege against self-incrimination incorporated in Evid.R. 23, 24 and 25, now N.J.R.E. 501, 502 and 503. State v. Hartley, supra, 103 N.J. at 260, 511 A.2d 80.

I
Defendant was arrested the night of June 13, 1990, by the Orange Police Department in connection with an investigation of burglaries on the North side of Park Avenue. Defendant's first contact with Detective Louis Castro, who was assigned to the investigation, was on June 14th at about 8:00 a.m. in the Detective Bureau. When Detective Castro asked defendant to read Miranda warnings from a poster on the door in the Detective Bureau, defendant informed the detective that he was unable to read or write. Defendant said he only reached the eighth or ninth grade in school. Detective Castro then read the Miranda warnings to defendant. After reading the Miranda warnings to defendant a second time, Detective Castro had defendant place his initials beside each of the five statements comprising the warnings. The initials were intended to represent an acknowledgement that defendant understood the warnings.
Detective Castro testified further that defendant also verbally acknowledged that he understood each of the warnings after the detective repeated each. Then, Detective Castro asked defendant to contact a relative or friend to witness any statement he might give because defendant was illiterate. Neither defendant nor Detective Castro, however, was able to have someone come to the police station at that time. During an interview with defendant, he told the detective he had committed a number of burglaries in Orange and he implicated others. Detective Castro was called away on another matter before taking a recorded statement from defendant on June 14, 1990.
*381 Detective Castro next saw defendant at approximately 8:00 a.m. on June 15. He again gave defendant fresh Miranda warnings while following the same procedure utilized on June 14. Defendant stated that he was involved in a number of burglaries and suggested he would identify the places if driven around. Detective Castro and Detective-Sergeant Minotti drove defendant around, and he identified homes he burglarized. Defendant also gave details of each burglary which compared favorably with the police file. At the end of the tour, defendant was taken back to the Detective Bureau where he was again given fresh Miranda warnings before confessing to each burglary, following the previously described procedure. Seven written confessions were given by defendant. Detective Castro typed defendant's answers given during the questioning verbatim.
On June 19, defendant's niece, Shannon Jones, reviewed each confession with defendant at the police station. Jones, who completed the eleventh grade in school, signed a statement acknowledging that defendant told her he understood the Miranda warnings. In her signed statement, she was asked if defendant fully understood his Miranda waiver and she answered yes. In that same statement, she also indicated defendant said he "fully understood and that he did not have to say anything at all and could stop at any time." Consequently, by the time defendant told Jones he understood the warnings, he had been given Miranda warnings ten times and, according to Detective Castro, not once had defendant remotely suggested that he did not comprehend any of the warnings.
Dr. Matthew Johnson, a clinical psychologist, testified on behalf of defendant. He evaluated defendant on August 30, 1990, and September 14 or 15, 1990, concerning his competence to stand trial and his ability to waive the Miranda rights. Defendant was borderline retarded, his mental capacity was on par with the average ten-year old child, and his language comprehension was on a fifth grade level. It was Dr. Johnson's opinion that defendant possessed the capacity to stand trial, but he did not have the *382 sophistication to understand the Miranda warnings unless they were broken down and explained to him. He was also of the opinion that defendant understood that he had a right to a lawyer at trial, but he did not understand his right to a lawyer at the police precinct. Notwithstanding the fact that the warnings informed defendant "[y]ou have the right to talk to a lawyer and have him present while you are being questioned," Dr. Johnson felt defendant did not understand because the warnings were not broken down and explained to him.
Dr. Terrance Chamberlain, a forensic psychiatrist, testified for the State based on his October 11, 1990, evaluation of defendant to determine if he had the capacity to understand the Miranda warnings. He advised defendant that anything he said to him during the evaluation would go into his report and could be used in court. Defendant said he understood that concept but added that he did not understand the Miranda warnings. He understood the bail process and complained that his bail was too high, especially since he did nothing wrong.
After defendant denied understanding any of the Miranda warnings, Dr. Chamberlain discussed each of the five warnings with him. Defendant said that before and after the warnings, he knew he had the right to remain silent; he understood that anything he said could be used against him or for him in a court; and he understood that he had a right to an attorney during questioning, "but felt he was being pressured to sign the papers so that he could go home[.]" Defendant also acknowledged that he knew he had the right to stop talking "but felt pressured to talk to him [Detective Castro]."
Dr. Chamberlain concluded that defendant had "a basic rudimentary understanding of the rights." It was his opinion that defendant "basically understood he had the right to have an attorney." He concluded that defendant could understand all of the Miranda warnings when they were given to him, that he could waive those rights, and even though defendant's I.Q. was only 71, he had developed a "streetwise understanding" of the process *383 from friends. Finally, Dr. Chamberlain was of the opinion that further explanation of the warnings would have been required only if defendant had indicated in some fashion that he did not understand one or more of the warnings.
At the conclusion of the three-day suppression hearing which spanned a thirty-day period, the judge concluded he was convinced beyond a reasonable doubt defendant understood the Miranda warnings and that he voluntarily, knowingly and intelligently waived those rights before giving the confessions.

II
Defendant now contends that he did not knowingly and intelligently waive his Miranda rights. He argues that Dr. Johnson, whom the judge found to be "impressive," postulated that defendant could not understand the recitation of the warnings by Detective Castro "without individualized explanation of each component of those warnings," and that his opinion should have been accepted.
We reject this contention. The judge was not obligated to accept the opinion of Dr. Johnson even though he found he was an impressive witness. State v. Zola, 112 N.J. 384, 437, 548 A.2d 1022 (1988); Rubanick v. Witco Chemical Corp., 242 N.J. Super. 36, 48, 576 A.2d 4 (App.Div. 1990), modified on other grounds, 125 N.J. 421, 593 A.2d 733 (1991); County of Middlesex v. Clearwater Village, Inc., 163 N.J. Super. 166, 173-74, 394 A.2d 390 (App.Div. 1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979). Apart from that, Dr. Chamberlain testified that such an explanation was not required in this case because defendant never remotely suggested to Detective Castro that he did not understand the warning. He explained that Detective Castro used simple words when giving defendant the warnings and that although defendant has a low I.Q., he was streetwise and understood them.

III
Defendant further argues that the suppression motion should have been granted because the judge stated defendant "possibly" *384 did not understand his Miranda rights. We also reject this contention. The judge was clearly aware that the State was obligated to prove beyond a reasonable doubt that defendant made a knowing and intelligent waiver of his rights. State v. Bey, 112 N.J. 123, 134, 548 A.2d 887 (1988); State v. Miller, 76 N.J. 392, 404-05, 388 A.2d 218 (1978). The judge stated that even though there may be some "possible doubt," that did not rise to the level of the required reasonable doubt. The record is unmistakably clear that the judge concluded he was convinced beyond a reasonable doubt defendant understood the Miranda warnings. He also stated he was convinced beyond a reasonable doubt that defendant knowingly and intelligently waived his privilege against self-incrimination.
At the heart of this appeal is the thesis that because defendant's I.Q. is 71 and because he has the mental comprehension of a ten-year old child, the decision in State v. Flower, 224 N.J. Super. 208, 539 A.2d 1284 (Law Div. 1987), affirmed o.b., 224 N.J. Super. 90, 539 A.2d 1223 (App.Div. 1988), requires a reversal of the order denying his suppression motion. We reject this argument because Flower is factually inapposite and substantially distinguishable.
Flowers had an I.Q. of 69 and a vocabulary of a second or third-grade level without the ability to grasp concepts. Three of his teachers testified that he had been enrolled in special education classes and had to be spoken to in basic terms. Any instructions given to him had to be repeated by him before he understood. These three teachers were of the view that Flowers was unable to comprehend the Miranda warnings because he was afraid of going to jail. The judge observed Flowers while he was in the courtroom and stated that he was not only illiterate, but he did not know his right hand from his left and could not see from his right eye. There was some evidence of slurring speech, suggestive of some neurological problem. Based on these facts, the judge rejected the opinion of the State's psychiatrist that any person with the mental age of a six or seven-year old child, could understand and appreciate Miranda warnings and could knowingly *385 and intelligently waive them. Id. 224 N.J. Super. at 216, 539 A.2d 1284.
Although defendant is illiterate, has an I.Q. of 71 and left school at age 18 while attending special education classes, those factors are not dispositive of whether he understood the meaning of the Miranda warnings on June 14 and 15, 1990. A defendant's I.Q. is merely a factor in the totality of the circumstances to be considered. See State v. Ordog, 45 N.J. 347, 360, 212 A.2d 370 (1965), cert. denied sub nom., Ordog v. New Jersey, 384 U.S. 1022, 86 S.Ct. 1942, 16 L.Ed.2d 1025 (1966); State v. Daley, 45 N.J. 68, 73, 211 A.2d 354 (1965), cert. denied sub nom., Daley v. New Jersey, 384 U.S. 1022, 86 S.Ct. 1934, 16 L.Ed.2d 1023 (1966); Moore v. Dugger, 856 F.2d 129, 132 (11th Cir.1988). This principle is supported not only in the case law of New Jersey but also in the decisions of other jurisdictions. Commonwealth v. Tucker, 461 Pa. 191, 335 A.2d 704, 707 (1975) (the fact that defendant had an I.Q. in the range of 75 to 79 and could read at a grade level of 2.7 is, alone, insufficient to render his confession involuntary); People v. Tigner, 48 A.D.2d 762, 368 N.Y.S.2d 92, 93 (App.Div. 1975) (despite the fact that defendant was moderately or mildly mentally retarded with an I.Q. ranging from 50 to 70, his confession was deemed voluntary). Consistent with these cases, Dr. Chamberlain testified that a person's I.Q. cannot be correlated to understanding of Miranda warnings and that each case must be examined on an individual basis.
In the present case, once Detective Castro learned that defendant was illiterate, he attempted to contact family members to witness the questioning. This attempt was consistent with the fundamental fairness required when dealing with a juvenile as contemplated by State in the Interest of S.H., 61 N.J. 108, 115, 293 A.2d 181 (1972). Since no family member responded for nearly four days, the questioning was conducted in the absence of a family member.
Furthermore, we have examined the five warnings and note that simple words were used with each recitation. Dr. Chamberlain *386 observed that defendant was street wise. While there was no record of any prior arrest or conviction, defendant had been in jail about two days before he made his confessions. Presumably, that is what the trial judge had in mind when he referred to defendant's prior criminal involvement. Unlike the facts in Flower, the judge stated that although defendant did not testify, he observed him in the courtroom and saw nothing indicating the inability to understand the warnings. Significantly, both Dr. Johnson and Dr. Chamberlain agreed that defendant had the ability to understand the warnings. They differed, however, concerning the manner of questioning defendant to make certain he understood the warnings.
Our independent examination of the record, including the warnings and the confessions, persuades us to conclude that defendant comprehended the rational, logical concepts which comprise the Miranda warnings. Under the totality of the circumstances, defendant knowingly and intelligently waived his privilege against self-incrimination. North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979); State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975). Hence, the trial judge's finding beyond a reasonable doubt that defendant made a knowing and intelligent waiver of his rights is supported by sufficient credible evidence. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964).
The judgment of conviction is affirmed.