**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1488-17T4

BONNIE SHAIN,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

    Respondent-Respondent.

_____

> Submitted February 11, 2019 – Decided March 22, 2019
>
> Before Judges Gooden Brown and Rose.
>
> On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of Treasury.
>
> Charles D. Bodner, attorney for appellant.
>
> Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; George E. Loeser, Deputy Attorney General, on the brief).

PER CURIAM

Bonnie Shain appeals from an October 11, 2017 final agency decision of the Board of Trustees (Board) of the Teachers' Pension and Annuity Fund (TPAF). The Board adopted the initial decision of the Administrative Law Judge (ALJ), denying her application for accidental disability retirement benefits on the ground that she was not totally and permanently disabled. We affirm.

By way of background, a TPAF "member, under [sixty-five] years of age," is eligible for an accidental disability retirement pension "if said member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his [or her] regular or assigned duties[.]" N.J.S.A. 18A:66-39(c). Before considering such an application, a physician designated by the Board

> shall have certified to the [B]oard that [the member] is physically or mentally incapacitated for the performance of duty, and should be retired, and the employer shall have certified to the [B]oard that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular and assigned duties, the time and place where the duty causing the disability was performed, that the disability was not the result of his willful negligence[,] and that the member should be retired.
>
> [Ibid.]

In Richardson v. Board of Trustees, Police and Firemen's Retirement System, 192 N.J. 189 (2007), the Court clarified the meaning of the term "traumatic event," and set forth a five-pronged standard mandating that a pension system member seeking accidental disability benefits prove:

(1.) that he [or she] is permanently and totally disabled;

(2.) as a direct result of a traumatic event that is

a. identifiable as to time and place,

b. undesigned and unexpected, and

c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

(3.) that the traumatic event occurred during and as a result of the member's regular or assigned duties;

(4.) that the disability was not the result of the member's willful negligence; and

(5.) that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Id. at 212-13.]

On September 29, 2014, fifty-nine-year-old Bonnie Shain, then a seventeen-year veteran physical education teacher, applied for accidental disability retirement benefits based on injuries sustained on January 9, 2014,

when she was hit in the head while "spotting" a student in gym class (the incident). On April 2, 2015, the Board denied Shain's application. "Although the Board found that the incident . . . was identifiable as to time and place and . . . was undesigned and unexpected, there [was] no evidence in the record of direct causation of a total and permanent disability." Thus, the Board concluded Shain was "not totally and permanently disabled from the performance of [her] regular and assigned job duties[,]" and was "not physically or mentally incapacitated from the performance of [her] usual or other duties that [her] employer [was] willing to offer." Shain filed an administrative appeal and the matter was transmitted to the Office of Administrative Law (OAL) as a contested case. See N.J.S.A. 52:14B-1 to -15; N.J.S.A. 52:14F-1 to -13.

During the ensuing OAL hearing conducted on May 2, 2017, Shain, and two experts testified, Robert Sica, Ph.D., a clinical neuropsychologist and Shain's treating doctor, and Steven Lomazow, M.D., a Board certified neurologist designated by the Board. Shain testified about the incident, her injuries and resulting symptoms, as well as her preexisting medical conditions. According to Shain, on January 9, 2014, while "spotting" a student for a gymnastics program, the student hit her in the head, knocking her to the ground. Although she did not lose consciousness, she attempted to see the school nurse,

but was unable to do so due to other emergencies and a variety of other reasons. Ultimately, she went to the emergency room where she was treated and released with a broken nose and a stiff neck.

Thereafter, Shain was evaluated by several doctors through her employer's workers' compensation provider, including a cognitive evaluation performed by Dr. Brett Prince, Ph.D., a psychologist, and a subsequent evaluation performed by Dr. Richard Filippone, Ph.D., a neuropsychologist. Shain was repeatedly directed to return to work despite reporting cognitive impairments resulting from the incident that primarily manifested themselves in difficulty concentrating and remembering. For example, on more than one occasion, Shain inadvertently left students in the hallway or on the playground.

According to Shain, by September 2014, her condition worsened. Specifically, she was transposing numbers and letters, writing things backwards, going to the wrong building for meetings, inverting the order of her lesson plans, and having difficulty preparing and maintaining electronic school records. She also had difficulty driving, turning her head from side to side, and adjusting to daylight savings time, which resulted in her missing classes or arriving late. At home, she put her cell phone in the freezer, her husband's shoe in the refrigerator, and her keys in the pantry. On one occasion, while babysitting, she

5

caused her granddaughter to fall out of the car because she forgot her granddaughter was in the car.

Shain acknowledged that "[s]ince her thirties," "every three[ to] four months" she had experienced "short stabbing pain . . . throughout [her] body[,]" that sometimes "went to [her] head." The pain lasted "one to two second[s]" and then "would go away." However, since the incident, "the head pain" became "headaches" that would only "subside" with "a migraine pill" and would last anywhere from "a half hour" to "three days or more."

Additionally, prior to the incident, based on MRIs,[1] several doctors had detected "brain lesions." As a result, Shain had been under the care of Dr. Boris Furman, a neurologist, and was also seen by Dr. Stuart Cook, a multiple sclerosis (MS) specialist. However, both Drs. Cook and Furman ruled out MS. Shain's past medical history also included longstanding hearing loss, chronic tinnitus, and rheumatoid arthritis.

In December 2014, Shain began treating with Dr. Sica and continued until August 2015. Dr. Sica provided Shain with "[n]europsychological [c]are or [n]europsychological [r]ehabilitation" to "help [her] obtain a better perspective, . . . better control, [and] a . . . more efficient means of dealing with the deficits

---

[1] Magnetic Resonance Imaging.

in [her] daily functioning." Although Dr. Sica acknowledged that Shain was better after treatment than before, nevertheless, he opined that Shain was not capable of performing her duties as a teacher "[b]ecause of the cognitive deficits she incurred" as a result of the incident and the resulting physical, psychological, and behavioral changes. While Dr. Sica did not actually diagnose Shain's head injury, he "validated" the diagnosis of the other doctors who had examined her before she started treatment, and confirmed that Shain's cognitive complaints were caused by the trauma of the incident.

Dr. Sica explained that Shain had "[p]ost [c]oncussion [s]yndrome," which manifested itself in "physical complaints," "psychological or behavioral changes[,]" and "neurocognitive or thinking changes." According to Dr. Sica, "[t]he assembly of physical, psychological[,] and cognitive" symptoms "constitute[] what[] [was] called a [c]oncussion or mild traumatic brain injury" and the prolonged duration of symptoms constituted "what[] [was] called a [p]ost [c]oncussion [s]yndrome." Although Dr. Sica acknowledged that he relied on Shain's subjective complaints, he testified that those complaints were supported by "objective measures" derived from his examination, which "produce[d] a set of scores" documenting her poor performance "on a variety of sub[-]tests that [made] up the battery."

7

Dr. Sica also reviewed Shain's "IQ tests" administered after the incident, and opined that Shain's reported diminution in intelligence quotient was caused by the incident because otherwise, it was "unlikely" she would have been able to get a job as a teacher or obtain a Master's Degree. While Dr. Sica acknowledged that age and brain lesions could cause cognitive complaints, he rejected them as the cause of Shain's complaints because Shain was functioning fine beforehand and "was essentially asymptomatic."

Dr. Lomazow performed an independent medical evaluation (IME) on Shain on January 2, 2015. Contrary to Dr. Sica, Dr. Lomazow concluded that Shain was not "totally and permanently disabled . . . as a consequence of the injury," and any symptomology did not result from the incident. The ALJ described Dr. Lomazow's physical examination of Shain as follows:

> [A] cranial nerve examination . . . revealed pupils equal, round, and reactive. Extraocular movements, including those enervated by the third, fourth, and sixth cranial nerves, were all full without evidence of disconjugate gaze or nystagmus. Facial sensation and muscles enervated by the fifth cranial nerves were intact. There was no evidence of any facial asymmetry, or peripheral or central seventh nerve dysfunction. Ninth cranial nerve (the gag reflex) was intact. Tenth cranial nerve (the gag reflex) was intact. There was no evidence of any sternocleidomastoid or upper trapezial weakness directly relating to injury to the eleventh cranial nerve. The tongue protruded in the mid-line, and there was no evidence of any atrophy. Motor

examination revealed no evidence of any specific loss of bulk, tone, or strength. Sensory examination revealed no evidence of loss of sensory function with respect to light touch, temperature, vibratory sense, pin, or proprioception. Gait examination also revealed no evidence of retropulsion or propulsion.

Likewise, Dr. Lomazow's mental examination of Shain revealed "no significant gross deficits in short-term memory, long-term memory, or intermediate memory." Additionally, "[t]here was no evidence of aphasia, word finding difficulties, paraphasic errors, or apraxia." Dr. Lomazow deferred his findings until he had reviewed Dr. Filippone's cognitive report, which concluded that "Shain suffer[ed] from a combination of a pain-related cognitive disorder and a potential post[-]concussive disorder" directly related to the injury, but was "certainly capable of working . . . full-time." While Dr. Filippone recommended further evaluation and treatment, he noted "[h]er days off from work [were] based primarily on physical pain-related issues and not psychological issues." Further, according to Dr. Lomazow, "[t]he only pain . . . referred to [by Dr. Filippone] was headaches of an explosive nature," which were "present prior to the incident" with a possible "exacerbation of such headaches as a consequence of th[e] injury."

Based on his review of Dr. Filippone's report, his review of Shain's medical history, and his examination, Dr. Lomazow opined that the incident was

9

not the sole and proximate cause of Shain's disability, but appeared to be "an exacerbation" of preexisting migraine headaches and some soft cognitive findings, which were not totally and permanently disabling. While he agreed that Shain's current symptoms were consistent with a post-concussion syndrome, Dr. Lomazow also acknowledged that brain lesions could cause cognitive issues "in some cases." Dr. Lomazow also explained that if Shain would "benefit[] from further evaluation and treatment[,]" as noted in Dr. Filippone's report, "then by definition, [she was] not totally and permanently disabled."

On September 7, 2017, the ALJ rendered an initial decision upholding the Board. In assessing the credibility of the witnesses, the ALJ found that Shain "appeared to be a credible witness" but "embellished many of her complaints." Although Shain's "testimony was consistent with that of her expert," the ALJ posited that the "case turn[ed] on the credibility of the medical experts." In that regard, the ALJ noted that while "[b]oth medical experts proved to be credible, competent witnesses[,]" Dr. Lomazow "presented a more logical and persuasive opinion as to the issue of permanent and total disability and [Shain's] ability to perform the functions and duties of her job as a teacher."

Acknowledging the "general rule [that] . . . 'greater weight should be accorded to the testimony of the treating physician' as opposed to an evaluating

physician, who has only met with the employee on one occasion[,]" see Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171-72 (App. Div. 1955), the ALJ explained that "this guidepost [was] not unwaivable" and noted that other factors to consider in exposing "weaknesses" in expert testimony included whether the expert's "conclusions [were] based largely on the subjective complaints of the patient or on a cursory examination," or were "support[ed] in the records from other physicians[.]" See Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961).

In analyzing the expert testimony in the case, the ALJ reasoned:

> Dr. Sica is one of [Shain's] treating physicians and will be extended the same consideration generally afforded such professionals. Although Dr. Sica presented credible and sincere testimony regarding his examination of [Shain], he candidly acknowledged that his opinion was influenced by [Shain's] subjective complaints. Also, Dr. Sica stated that Shain "will not recover as quickly as a younger person." His recommendation was therapy to deal with her cognitive deficiencies. She could not perform her duties as [a] teacher due to mild traumatic brain injury due to the physical, psychological[,] and behavioral changes. Conversely, Dr. Lomazow, a Board-Certified Neurologist, made objective findings, which when compared to the demands of [Shain's] duties did not lead to a conclusion that [Shain] could not perform her job duties[,] and deficiencies were certainly not directly caused by the accident.

A-1488-17T4

Considering the foregoing, I found Dr. Sica's conclusions and the reasoning underlying those conclusions to be overborne by those offered by Dr. Lomazow. On balance, Dr. Lomazow offered a more logical explanation in evaluating [Shain's] neurologic condition, and I afford greater weight to his opinions regarding the nature and permanency of those conditions.

. . . .

I [find] that Dr. Lomazow's testimony presents a more compelling case against permanent and total disability and direct cause than Dr. Sica does for a finding of disability. Significantly noteworthy was Dr. Lomazow's explanation of the need to tie observations contained in objective testing to actual clinical findings which he did not perceive upon examination. His opinion that the brain lesions were the likely source of Shain's complaint[s] simply renders a more credible and believable opinion.

Relying on Gerba v. Board of Trustees, Public Employees' Retirement System, 83 N.J. 174, 187 (1980), and Petrucelli v. Board of Trustees, Public Employees' Retirement System, 211 N.J. Super. 280 (App. Div. 1986), the ALJ acknowledged that "[w]here an employee 'is afflicted with an underlying physical disease bearing causally upon the resulting disability[,] . . . the traumatic event need not be the sole or exclusive cause of the disability'" "[a]s long as the traumatic event is the . . . essential significant or substantial contributing cause of the disability, . . . even though it acts in combination with

an underlying physical disease." However, based on Dr. Lomazow's "more compelling case against permanent and total disability and direct cause," as well as the report from Dr. Filippone, "coupled with the concerns . . . regarding the exaggerated nature of Shain's testimony," the ALJ concluded that:

> [Shain] ha[d] not proven by a preponderance of the credible evidence that she [was] permanently and totally disabled from her regular and assigned duties as a teacher, and that she [was] physically incapacitated from performing her usual or any other duty that her employer [was] willing to offer. . . . [L]ikewise[,] . . . [Shain] ha[d] not proven by a preponderance of the credible evidence that her disability occurred as a direct result of a traumatic event, and the work accident was not the essential significant or substantial contributing cause of [Shain's] disability.

Accordingly, the ALJ affirmed the Board's denial of accidental disability on the basis of permanent injury and direct cause. After considering Shain's exceptions, the Board adopted the ALJ's decision and this appeal followed.

On appeal, Shain contends the ALJ made findings "which amounted to plain error[,]" including concluding that "brain lesions were the source of Shain's complaints[,]" relying on "Dr. Lomazow's gross neurological testing" and "assessment of Shain's disability," discounting "Dr. Sica's opinion" when he was her treating physician, and relying on Dr. Filippone's opinion, which was made prior to Shain completing treatment. We disagree.

13

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Reviewing courts presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). For those reasons, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Application of Virtua-West Jersey Hosp. for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious[,] or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

"Where . . . the [agency's] determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba, 83 N.J. at 189. "[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could

14                                                                    A-1488-17T4

reasonably so conclude upon the proofs." Brady v. Bd. of Review, 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985)). That said, appellate courts review de novo an agency's interpretation of a statute or case law. Russo, 206 N.J. at 27.

Applying these principles, we are satisfied the medical testimony and records support the ALJ's decision and the Board's adoption of that decision. Because the Board's determination was amply supported by credible evidence, and was neither arbitrary, capricious, nor unreasonable, we discern no basis to intervene. The crux of Shain's challenge is that the ALJ erred in his assessment of the credibility of the experts, and thus erred in concluding she failed to meet her burden of proof. An individual seeking accidental disability retirement benefits must prove a disabling permanent injury, and must produce "such expert evidence as is required to sustain that burden." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 51 (2008). We give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility[,]" In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)), and defer to credibility findings "that are often influenced by matters such as observations of the character and demeanor of witnesses and common

human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999).

In particular, the weight the factfinder accords to expert testimony "is within the competence of the fact[finder]." LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). The factfinder is not obligated to accept an expert's opinion, even if the expert was "impressive[,]" State v. Carpenter, 268 N.J. Super. 378, 383 (App. Div. 1993), and may accept some of the expert's testimony and reject the rest, Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993), even if that testimony is unrebutted by any other evidence. Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997). In essence, the factfinder, must use its "common sense and ordinary experience[,]" In re Yaccarino, 117 N.J. 175, 196 (1989), particularly "when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts." State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004).

"[T]he choice of accepting or rejecting the testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Renan Realty Corp. v. State, Dep't of Cmty. Affairs, Bureau of Hous. Inspection, 182 N.J. Super 415, 421 (App. Div. 1981). Here,

according the appropriate deference to the ALJ's credibility determinations, there is substantial evidence in the record to support the ALJ's factual findings and legal conclusions, which the Board adopted. "We rely upon the expertise of the [Board] to separate legitimate from illegitimate claims," Patterson, 194 N.J. at 51, and we are satisfied that the Board's "determination [here] is founded upon sufficient credible evidence seen from the totality of the record." Gerba, 83 N.J. at 189. See R. 2:11-3(e)(1)(D).

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION