# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1050-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SILVER IQUCHUKWU,

     Defendant-Appellant.

_____

> Argued January 24, 2022 – Decided February 14, 2022
>
> Before Judges Sabatino and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 18-04-0282.
>
> Rachel A. Neckes, Legal Fellow, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Nakea J. Barksdale, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Lauren Bonfiglio, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Lauren Bonfiglio, of counsel and on the brief).

PER CURIAM

After a jury found defendant Silver Iquchukwu guilty of first-degree aggravated sexual assault on a helpless or incapacitated victim, N.J.S.A. 2C:14-2(a)(7), Judge Mitzy Galis-Menendez sentenced him to a fifteen-year custodial term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge also imposed applicable fines and penalties as well as Megan's Law registration requirements, N.J.S.A. 2C:7-2, parole supervision for life, N.J.S.A. 2C:43-6.4, and a Nicole's Law sexual offender restraining order, N.J.S.A. 2C:44-8.

Defendant challenges his conviction and sentence arguing:

POINT I

> THE COURT ERRED IN FINDING THE DEFENDANT'S STATEMENTS TO THE HUDSON COUNTY PROSECUTOR'S OFFICE WERE ADMISSIBLE BECAUSE DEFENDANT DID NOT UNDERSTAND ENGLISH VERY WELL AND, THUS, DID NOT KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE HIS MIRANDA RIGHTS. U.S. CONST. AMENDS. V and XIV.

POINT II

> A 15-YEAR NERA SENTENCE FOR A FIRST-TIME OFFENDER IS EXCES[S]IVE AND MUST BE REDUCED BECAUSE THE TRIAL JUDGE ERRED IN ITS FINDING AND WEIGHING OF AGGRAVATING AND MITIGATING FACTORS. U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. ART. I, PARS. 9 AND 10.

2

Further, at oral argument, defendant's appellate counsel contended that defendant could not have knowingly waived his Miranda[1] rights because of his limited intellectual capabilities as revealed during a pre-sentence evaluation referenced by defendant's trial counsel at sentencing. We reject defendant's arguments and affirm his conviction and sentence, but remand for the limited purpose of amending the Judgment of Conviction (JOC) to clarify that defendant is subject to the provisions of Nicole's Law including the imposition of an applicable restraining order.

## I.

On October 28, 2017, eighteen-year-old F.S. (Fiona)[2] met with two friends around 7:00 p.m. and headed to a Halloween party. On the way, they stopped at a liquor store and purchased a bottle of wine. During their hour-and-a-half commute, Fiona drank a cup of wine and smoked marijuana. Once they arrived at the party, Fiona had approximately two mixed drinks. She and her friends stayed at the party for about two hours before heading home by train. She had

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] We use initials and a pseudonym to protect the privacy and preserve the confidentiality of the victim. R. 1:38-3(c)(9).

a final cup of wine as she proceeded to the train. She only remembered part of her travels after the party.

The next thing Fiona remembered was waking up on a couch in an unfamiliar tattoo parlor without her shoes or belongings. When she awoke, she observed two men who she did not know, a "middle aged Hispanic" man, and defendant, who was asleep. Fiona asked the Hispanic man what happened, to which he shook his head and said, "you got fucked." Fiona was speechless, "felt really weird," and suspected something was not right because her jumpsuit and undergarments were both on backwards.

Defendant then awoke, gave Fiona her missing belongings, and asked her if she wanted coffee or something to eat. Because she wanted to know more about what happened, Fiona agreed and went to Dunkin Donuts with defendant. Defendant told Fiona he found her late at night and brought her to his home. He then walked Fiona to the end of her block and stored his name and number into her phone.

After returning home, Fiona went to Jersey City Medical Center to be examined because she believed she had been sexually assaulted. At the hospital, an emergency department nurse performed a forensic medical examination.

A-1050-19

Samples from that exam were analyzed by an expert in biological strain analysis who ruled out the presence of semen.

Detective Michael Doherty of the Hudson County Prosecutor's Office Special Victim's Unit responded to Jersey City Medical Center and spoke with Fiona. Detective Doherty began an investigation which led him to Nu Flavor Kutz, a barbershop in Jersey City. There, he requested, and was granted access to, the shop's surveillance videos from October 28 and 29, 2017. Upon viewing the footage, Detective Doherty observed a woman fitting Fiona's description with two men. He spoke to the shop's owner, Salvatore Perez, who identified the men as his brother and defendant, who was present at the shop. Detective Doherty notified defendant that they were investigating an assault and defendant agreed to speak with him.

Detective Doherty transported defendant to the Hudson County Prosecutor's Office Special Victim's Unit. Before interviewing defendant, Detective Doherty informed defendant of his <u>Miranda</u> rights orally and in writing, and defendant signed a form stating that he understood and waived those rights.

Defendant then gave a video-recorded statement. He described that he worked at Nu Flavor Kutz as a cashier and lived in the basement, which formerly

operated as a tattoo parlor. He also stated that Perez's brother, Brian, lived in an upstairs apartment in the same building.

Regarding the night in question, defendant described that he and Brian encountered Fiona outside Brian's apartment. He stated she was "fucked up" and had urinated on herself, and that he thought she was a "crackhead." He claimed that at Brian's insistence, he carried Fiona to the basement to let her sleep on a sofa. Defendant stated that Fiona was unable to respond coherently when he spoke to her and urinated on herself again. Although defendant initially denied touching any of Fiona's intimate parts, having sex with her, or penetrating her with his penis or fingers, he later admitted to putting his finger inside her vagina.

At the conclusion of the interview, defendant was placed under arrest. He was indicted and charged with one count of first-degree aggravated sexual assault on a helpless or incapacitated victim. Before proceeding to trial, the State moved under N.J.R.E. 104(c) and N.J.R.E. 803(b) to admit the video-recorded statement defendant made to Detective Doherty. Judge Galis-Menendez heard the motion over two days and granted the State's application on November 7, 2018.

In support of its motion, the State introduced as evidence defendant's signed <u>Miranda</u> waiver form, the entirety of the approximately three-hour video-recorded statement, and the 147-page transcript of the questioning and interrogation conducted by Detective Doherty. In relevant portions, and early in the interview, defendant stated he was born in Nigeria and Detective Doherty noted that he spoke with a "thick accent." Detective Doherty then instructed defendant on his <u>Miranda</u> rights. As noted, he first read defendant his rights orally and defendant responded to each identified right by indicating he understood each one. Detective Doherty inquired if defendant was able to "read and write the English language," and he confirmed that he could.

Detective Doherty then provided a written <u>Miranda</u> form to defendant. He first asked defendant to read the first right on the form out loud and initial it to confirm he understood it. Defendant complied without any apparent difficulty. Detective Doherty then asked defendant to read the remaining rights to himself and initial alongside each one to confirm his understanding, which he did.

Detective Doherty then asked, "Having these rights in mind, do you wish to answer my questions?" and defendant responded "Yeah." Detective Doherty then read defendant a "waiver of rights" and asked if defendant understood that

waiver. Defendant again responded that he did. At Detective Doherty's instruction, defendant then read the waiver and signed it.

Before placing him under oath, Detective Doherty asked defendant "do you know what an oath is?" Defendant confirmed his understanding, stating that an oath is "what you pledge . . . like a commitment."

Thereafter, Detective Doherty asked a series of preliminary questions. Defendant first stated he was not a United States citizen. When asked again whether he could "read and write the English language" defendant stated "Yeah, but not very well." Defendant stated he had been in the United States for approximately three years and had studied business administration at a college in Ohio before dropping out. Detective Doherty then asked if defendant could "understand what . . . [they were] talking about," and he responded that he could. Detective Doherty instructed defendant that if he did not understand something that he could ask to have the question repeated. Defendant also voluntarily consented to providing a buccal swab to determine if his DNA was present on, or within, the victim.

Defense counsel cross-examined Detective Doherty at the admissibility hearing regarding his interview of defendant. Detective Doherty conceded he never inquired whether "English was [defendant's] native language," whether

8

"English is . . . a common language in Nigeria," or whether defendant "might feel more comfortable speaking in whatever his native language was." Detective Doherty also said he never asked where defendant learned or how long he studied English, and "[did not] try to find [an] interpreter for him."

Defense counsel also elicited testimony that "throughout the course of the interview . . . there was some trouble with phrasing." Specifically, defendant seemingly did not understand Detective Doherty's instruction to "initial" the Miranda form and had to ask for clarification. Further, defendant repeatedly said he was "a little bit sober" when he meant "a little bit drunk," requiring clarification from Detective Doherty.

Finally, defense counsel inquired about Detective Doherty's administration of defendant's Miranda rights. Detective Doherty stated he "didn't explain [the Miranda rights] in detail beyond what was on the form" and "didn't ask [defendant] to explain [the] rights back to [him] . . . in his own words." He also stated that he "didn't ask [defendant] if he had ever heard [the Miranda rights] before," and did not inquire whether defendant had "watched any TV shows like Law & Order that might have given him some understanding of" his Miranda rights or "studied anything about the U.S. legal system in his college."

9

As noted, at the conclusion of the two-day hearing, Judge Galis-Menendez granted the State's application.  She concluded that "the statements provided [by defendant] were voluntary and they [would] not be suppressed for purposes of trial."  She explained that Detective Doherty read defendant his Miranda rights and "had defendant read the rights himself."  She found that defendant "specifically asked [Detective Doherty] questions and it was a colloquy back and forth."  The judge explained that "the fact that defendant comes from another country and didn't hear [Miranda rights] over and over again [is not] a negative thing," explaining that "hear[ing] it all the time" "on TV" and "in school" can "desensitize[]" people to the point where "we don't appreciate the significance and the profoundness of those words."

Judge Galis-Menendez also explained that although "defendant is from Nigeria . . . he's been in this country for three years" and found that the "interrogation was very conversational," and defendant was "well[-]spoken and articulate."  She stated that when defendant did not understand something he asked "appropriate questions," and determined "[t]here [was] nothing in the interview to suggest that he didn't understand," Detective Doherty's questions or instructions.  Finally, the judge found that although "the interview was three

10

hours in duration . . . nothing [about it] was intimidating" and "there was no indication of any coercion of any kind."

Judge Galis-Menendez also presided over defendant's three-day jury trial in July 2019. At trial, the State's evidence included testimony from Fiona and Detective Doherty, the video-recording and transcript of defendant's statements to Detective Doherty, and surveillance video obtained from Nu Flavor Kutz and the former tattoo parlor.

The surveillance video showed defendant carrying Fiona to the basement of the barbershop on his back and placing her on a couch, where she appeared to be unconscious. Although the video from the tattoo parlor was dark and partially obstructed, it clearly showed defendant removing Fiona's clothes, touching her vagina and buttocks, using a cellphone flashlight to get a better view of her, getting on top of Fiona with his pants partially down, and thrusting his hips towards her repeatedly.

The jury convicted defendant and at sentencing the State requested Judge Galis-Menendez impose a twenty-year sentence subject to the No Early Release Act, along with Megan's Law registration, parole supervision for life and Nicole's Law restraining order. The State also requested the court apply aggravating factor one, N.J.S.A. 2C:44-1(a)(1), that the crime was committed

11

"in an especially heinous, cruel or depraved manner," and factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter defendant and others from committing similar types of offenses. The State stressed that defendant's actions should be treated as a first-degree crime because the victim was "clearly unconscious", and defendant repeatedly assaulted her.

Defendant's counsel requested a sentence in the second-degree range. In support, he referenced defendant's low intellectual testing scores as reflected in a post-trial report prepared by the Adult Diagnostic and Treatment Center in Avenel. He explained that defendant scored in the ".01 percentile" on vocabulary, which "put him in the low mentally deficient range of intellectual ability." While acknowledging that the score could have been affected by English being defendant's second language, defense counsel explained that defendant also scored in the fifth percentile of a "nonverbal intelligence" test, which represented "the poor borderline range of intellectual functioning."

As noted, Judge Galis-Menendez sentenced defendant to a fifteen-year term of imprisonment subject to NERA and parole supervision for life, imposed Megan's Law registration requirements, and entered a Nicole's Law sexual offender restraining order. In reaching her decision, Judge Galis-Menendez found applicable aggravating factor nine and mitigating factor seven, N.J.S.A.

12

2C:44-1(b)(7), "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense."

In support of aggravating factor nine, the judge stated that defendant "had the opportunity to be a hero" and "could have saved somebody who needed help and instead what transpired was the most intolerable breakdown in humanity," and "[gave] great weight to aggravating factor number [nine]." As to mitigating factor seven, Judge Galis-Menendez explained that defendant "ha[d] no prior history of delinquency," and afforded the factor "average weight given the fact that [defendant] [was] only in this country for three years." The court also concluded that aggravating factor nine outweighed mitigating factor seven. This appeal followed.

## II.

In his first point, defendant contends that Judge Galis-Menendez improperly admitted his statement to Detective Doherty. Specifically, he claims "his lack of fluency in English and his inexperience with the American criminal justice system," "rendered him unable to knowingly, intelligently, and voluntarily waive his Miranda rights."

13

He further asserts Detective Doherty never inquired into defendant's "literacy or educational background" or "familiarity with the criminal justice system" and never "made any effort to find an interpreter for [defendant] nor did he inquire whether [defendant] would feel more comfortable with the aid of an interpreter." He also claims his language barrier was "evident" because Detective Doherty "had trouble understanding [defendant] and had to ask him to either repeat or clarify his responses a couple of times" and defendant "was unable to accurately explain his level of intoxication" and "accurately describe relative directions, such as 'up' and 'down.'" He also argues "the mere fact that a person can read Miranda warnings aloud and/or speak some of the English language should not lead to the conclusion that a suspect's English-language skills are sufficient for him to understand and waive his constitutional rights." Finally, defendant asserts that the recorded statement was "critical to the State's case" and, as such both suppression of his statement and reversal of his conviction are warranted. We have reviewed the entire record thoroughly, including the video and transcript of defendant's statements made to Detective Doherty, and find defendant's arguments without merit.

"We review the trial court's factual findings as to defendant's Miranda waiver in accordance with a deferential standard." State v. Tillery, 238 N.J. 293,

14

314 (2019). In conducting that review, we "defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We "defer to the trial court's factual findings because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting Elders, 192 N.J. at 244). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate court may also review." Tillery, 238 N.J. at 314.

It is well-settled that "[c]onfessions obtained by the police during a custodial interrogation are barred from evidence unless the defendant has been advised of his or her constitutional rights." State v. Knight, 183 N.J. 449, 461 (2005). A waiver of the constitutional right against self-incrimination must be voluntary, knowing, and intelligent. Ibid. (citing Miranda, 384 U.S. at 444). In New Jersey, the burden is upon the State to prove the validity of a Miranda

waiver beyond a reasonable doubt. State v. O'Neill, 193 N.J. 148, 168 n. 12 (2007).

"A waiver may be 'established even absent formal or express statements.'" A.M., 237 N.J. at 397 (quoting Berghuis v. Thompkins, 560 U.S. 370, 383 (2010)). "Indeed, '[a]ny clear manifestation of a desire to waive is sufficient.'" Tillery, 238 N.J. at 316 (alteration in original) (quoting State v. Hartley, 103 N.J. 252, 313 (1986)).

To determine the adequacy of waiver, "the trial court reviews 'the totality of the circumstances surrounding the custodial interrogation.'" Tillery, 238 N.J. at 316 (quoting A.M., 237 N.J. at 398). "The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances." State v. Kremens, 52 N.J. 303, 311 (1968). Factors include personal characteristics such as the defendant's age, education, and intelligence, as well as indicators of the nature of the interrogation, such as the length in detention and whether physical or mental exhaustion were involved in obtaining the confession. See State v. Galloway, 133 N.J. 631, 654 (1993). Courts may also consider a defendant's previous interactions with law enforcement. Knight, 183 N.J. at 463.

In soliciting a waiver, the interrogating officer must conduct an adequate inquiry. See Tillery, 238 N.J. at 318. To that end, the interrogating officer should "ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions." Ibid. "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis, 560 U.S. at 384.

Here, the totality of the circumstances fully supports Judge Galis-Menendez's finding that defendant's Miranda waiver was voluntary, knowing, and intelligent. Tillery, 238 N.J. at 316; Knight, 183 N.J. at 461. As noted, Detective Doherty ensured defendant understood his Miranda rights by: 1) orally reading defendant his Miranda rights and confirming he understood each one; 2) confirming defendant could sufficiently "read and write the English language"; 3) providing defendant with a written Miranda form; 4) ensuring defendant could read the form by having him read the first right aloud; 5) having defendant read the remaining rights and initial each confirming his understanding; and 6) asking defendant if he still wanted to answer questions after hearing his rights.

The detective then took similar precautions in obtaining from defendant a written waiver by orally reading it to defendant, confirming he understood the waiver, and providing the waiver to defendant in writing for him to sign. Detective Doherty's thorough inquiry was more than adequate in ensuring that defendant understood his rights and, in light of those rights, was willing to give a statement. See Tillery, 238 N.J. at 318. In sum, we are satisfied that the record provides no basis to challenge Judge Galis-Menendez's conclusion that defendant's waiver was knowing, voluntary, and intelligent, and his inculpatory statements therefore, admissible. Knight, 183 N.J. at 461.

We find defendant's arguments to the contrary unsupported by the record. While it is true that a language barrier hypothetically could render a Miranda waiver ineffective in some circumstances, no such obstacle appeared here. As Judge Galis-Menendez found, the interrogation was "very conversational," and defendant was "well[-]spoken and articulate." The recording of the interrogation fully supports these factual findings and judge's resulting legal conclusions. That defendant occasionally misused a word or phrase, and indicated that he was not able to read English very well, does not, in our view, provide support to challenge the judge's findings. Indeed, when his interactions with Detective Doherty are viewed in their entirety and in proper context, and

18

not improperly truncated, we are satisfied that the State has established beyond a reasonable doubt, that defendant was able to understand his Miranda rights and effectuated a voluntary waiver. Similarly, we agree with Judge Galis-Menendez that defendant's apparent inexperience with the criminal justice system does not undermine that express waiver.

Further, we solicited supplemental briefing to clarify whether the Attorney General had promulgated a policy requiring that interpreters be utilized in all instances where English is not an accused's primarily language. The Office of the Attorney General has advised that no such policy exists. In any event, we find beyond peradventure that defendant was sufficiently conversant in English such that an interpreter was not required under the circumstances presented. By way of example only, during his three-hour conversation with Detective Doherty conducted entirely in English, defendant, as noted, consented to waive his Miranda rights orally and in writing, agreed to a buccal swab, demonstrated an understanding of the meaning of an "oath," described the sexual assault, and detailed his post-assault conversation with the victim. We also find significant that defendant did not request an interpreter at trial or sentencing.

At oral argument, defendant's counsel raised for the first time an argument that his intelligence testing scores from his Avenel report demonstrate that he

lacked the cogitative capacity to understand, and therefore, properly waive his Miranda rights. We find this argument without merit as well.

First, we would be remiss if we did not note that defendant failed to raise this specific argument before Judge Galis-Menendez, or in his initial brief before us. Indeed, before the judge and in his merits brief, defendant raised the post-trial report solely as it related to defendant's sentence, not as further support that his waiver was not knowing and voluntary. As such, we could have declined to address it. See State v. Robinson, 200 N.J. 1, 18-19 (2009) ("The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."); N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

In light of the fact that we solicited additional briefing on this issue primarily to permit the State an opportunity to respond to defendant's newly minted argument, we consider defendant's contention on the merits and find no reason to vacate defendant's conviction and remand for further proceedings. As noted, the adequacy of a Miranda waiver is based on "the totality of the circumstances surrounding the custodial interrogation," Tillery, 238 N.J. at 316

(quoting A.M., 237 N.J. at 398), which takes into consideration defendant's intelligence, Galloway, 133 N.J. 631, 654.

A defendant's limited intellectual functioning, while clearly relevant, is not dispositive in determining whether Miranda rights were understood. See State v. Carpenter, 268 N.J. Super. 378, 385 (App. Div. 1993). For example, in Carpenter, an illiterate defendant with an I.Q. of 71 and "the mental comprehension of a ten-year old child" provided statements to a detective after being advised of his Miranda rights. Id. at 380, 384-85. We affirmed the trial court's finding that defendant adequately understood and waived his rights, concluding that "defendant comprehended the rational, logical concepts which comprise the Miranda warnings." Id. at 386; see also State v. Cabrera, 387 N.J. Super. 81, 87, 102 (App. Div. 2006) (holding the confession of a defendant with a middle-school education obtained in Mexico and low I.Q. was made voluntarily and was admissible).

Here, the totality of the circumstances supports Judge Galis-Menendez's finding that the State established defendant's waiver beyond a reasonable doubt. We find nothing in the record to indicate that defendant's level of intelligence rendered him unable to understand and properly waive his Miranda rights. Detective Doherty meticulously advised defendant of his rights and ensured he

21

understood them before engaging him in an approximately three-hour interview to which he was an active and responsive participant. Not to belabor the point, and by way of example only, in that interview, defendant revealed that he was employed and attended college before dropping out and he provided a coherent and detailed account to Detective Doherty regarding how he met Fiona before repeatedly assaulting her and explained how he later engaged in discussions with her involving the ills of drinking.

The Avenel report relied upon by defendant provides no basis to depart from Judge Galis-Menendez's finding that defendant's waiver was knowing, voluntary, and intelligent. Although defendant's intellectual testing scores were admittedly low, the report explains that the results may have been affected by defendant "being raised in Nigeria and learning English as a second language." The report also found "no indication of . . . neurological impairment" and stated that defendant completed "a number of [written] self-report questionaries" as well as a verbal interview, in which defendant's "[t]hought processes, as measured by speech, were adequately organized." Finally, the report included that defendant "graduated from high school in Nigeria, and entered the United States on a student visa." As such, we have no reason to conclude that defendant

was unable to "comprehended the rational, logical concepts which comprise the Miranda warnings." Carpenter, 268 N.J. Super. at 386.

## III.

In defendant's second point, he argues his sentence was excessive. Specifically, he contends that Judge Galis-Menendez "failed to articulate why [she] placed particular emphasis on aggravating factor nine" and relies on State v. Case, 220 N.J. 49 (2014) for the proposition that the judge "misuse[d] aggravating factor nine . . . to express [her] repugnance against a defendant or the type of offense he . . . committed," resulting in "a form of double counting" and lack of uniformity in sentencing. He further claims Judge Galis-Menendez failed to explain the need to deter defendant specifically and because Judge Galis-Menendez applied improper weight to aggravating factor nine, her sentencing "calculus" was materially altered, warranting a resentencing. We are unpersuaded by any of these arguments.

"Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." Case, 220 N.J. at 65. We must affirm a sentence unless: 1) the trial court failed to follow the sentencing guidelines; 2) the court's findings of aggravating and mitigating factors were not based on competent and credible evidence in the

23                                                                    A-1050-19

record; or 3) "the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." State v. Fuentes, 217 N.J. 57, 70 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Further, we are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Grate, 220 N.J. 317, 337 (2015) (alteration in original) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)). To be accorded such deference, the sentencing court is required to "identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989); see also N.J.S.A. 2C:43-2(e). "If the court determines when it [sentences] defendant that aggravating factor nine applies, it should address both general and specific deterrence . . . ." Fuentes, 217 N.J. at 81.

Judge Galis-Menendez appropriately applied and weighed the aggravating and mitigating factors and provided an adequate explanation for her decision. In applying and affording "great weight" to aggravating factor nine, Judge Galis-

24

Menendez explained that defendant "had the opportunity to be a hero" and "save[] somebody who needed help" and instead engaged in "the most intolerable breakdown in humanity." This explanation expressly addressed the need to deter defendant from his incredibly poor decision-making, which resulted in his commission of a crime involving the victimization of a helpless individual. The judge's comment also addressed the need for general deterrence, and she did not engage in improper double counting.

Finally, we find defendant's reliance on State v. Case, 220 N.J. at 66-70, unpersuasive. In that case, the Supreme Court vacated defendant's sentence and remanded for a new hearing as the sentencing proceeding was "flawed for multiple reasons," including the sentencing court's failure to explain its "reason for placing 'particular emphasis on aggravating factor nine'—the need for both specific and general deterrence," and to qualitatively weigh the aggravating and mitigating factors in a case involving a discretionary parole disqualifier. Id. at 54, 66-70.

The infirmities at issue in the Case sentencing simply do not exist here as the court adequately explained the bases for relying on aggravating factor nine. As noted, Judge Galis-Menendez determined based on the evidence in the record, which included defendant's sexual assault of an incapacitated victim,

that defendant engaged in the type of conduct that supported the need for both general and specific deterrence.

Finally, defendant's sentence for this heinous crime does not "shock [our] judicial conscience." Indeed, despite finding that "the aggravating factor . . . outweigh[s] the [sole] mitigating factor," Judge Galis-Menendez imposed a sentence in the middle of the first-degree range. Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 365); see N.J.S.A. 2C:43-6(a)(1). Judge Galis-Menendez's findings are fully supported by the record, consistent with the Code of Criminal Justice, and worthy of our deference. Fuentes, 217 N.J. at 70.

IV.

Finally, the State asserts a limited remand is necessary to correct a clerical error on defendant's October 11, 2019 JOC. We agree.

Judge Galis-Menendez properly imposed a Nicole's Law sexual offender restraining order, and the JOC contains a note that "Nicole's Law applies." However, on the second page of the JOC, the court left unchecked a box indicating the imposition of a Nicole's Law sexual offender restraining order.

Rule 1:13-1 provides "Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight and omission may at any time be corrected by the court on its own initiative or on the motion of

26

any party, and on such notice and terms as the court directs . . . ." <u>See</u> <u>also</u> <u>State</u> <u>v. Abril</u>, 444 N.J. Super. 553, 564 (App. Div. 2016) ("In the event of a discrepancy between the court's oral pronouncement of sentence and the sentence described in the judgment of conviction, the sentencing transcript controls, and a corrective judgment is to be entered."). As such, we remand for the sole purpose of correcting the JOC to clearly indicate the applicability of Nicole's Law and the imposition of the necessary restraining order, consistent with Judge Galis-Menendez's oral decision at sentencing.

To the extent not addressed, we determine the balance of defendant's arguments to be without sufficient merit to warrant further discussion. <u>R.</u> 2:11-3(e)(2).

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION