# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1713-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

T.S.B.,

    Defendant-Appellant.

_____

Submitted May 12, 2026 – Decided June 10, 2026

Before Judges Gooden Brown and Rosero.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-10-1168.

Jennifer N. Sellitti, Public Defender, attorney for appellant (John V. Molitor, Designated Counsel, on the briefs).

Linda Estremera, Middlesex County Prosecutor, attorney for respondent (Elizabeth K. Gibbons, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant T.S.B.[1] appeals from the January 23, 2025 Law Division order denying her petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm substantially for the reasons stated in Judge Joseph Paone's cogent written decision.

I.

Defendant entered a negotiated guilty plea to second-degree sexual assault and was sentenced in accordance with the plea agreement to ten years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23. The charge stemmed from defendant's stepson's, J.G.'s, disclosure to his therapist that he had been sexually assaulted by defendant.

Specifically, J.G., then age eight, revealed to his therapist that defendant, then age forty, had "sucked his penis" and "tongue kissed him" while J.G. was at his father's house. The therapist informed J.G.'s mother, who reported the allegations to the North Brunswick Police Department (NBPD) on July 21, 2017.[2]

---

[1] In light of the sensitive issues discussed in this opinion, we use initials to protect the parties' privacy. See R. 1:38-3.

[2] The therapist later told detectives J.G. had made the disclosure about five or six months earlier.

A-1713-24

In the ensuing investigation, Detective Oscar Ayala conducted a video recorded forensic interview of J.G. at the NBPD at 8:24 p.m. on July 21, 2017. During the interview, consistent with his prior disclosure, J.G. described how defendant removed his clothing, "kissed him on the mouth[,] and inserted his penis into her mouth." J.G. added that "it occurred on more than one occasion."

Around 11:00 p.m. the same night, defendant agreed to accompany law enforcement officers to police headquarters for questioning. Ayala and Detective John Strzykalski conducted the interrogation. After being administered her Miranda[3] rights, defendant waived her rights and gave a video recorded statement in which she ultimately confessed. Specifically, defendant admitted "she masturbated, fellated, and had vaginal intercourse with J.G. twice in the home she shared with J.G.'s father."

After defendant confessed, she was arrested and later charged in a Middlesex County indictment with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count two); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count three).

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1713-24

Defendant was initially represented by the Office of the Public Defender. The assigned attorney subpoenaed defendant's records from the New Jersey Division of Developmental Disabilities to assess defendant's cognitive disabilities. Among the records were reports indicating defendant was diagnosed at approximately ten years of age with "[m]ild [m]ental [r]etardation" and was found to have a "Full Scale IQ" of "55."[4]

Defendant later retained a private attorney who represented her at the 2018 plea and sentencing hearings. At a status conference,[5] defense counsel confirmed he provided "mental health information" to the prosecutor, explaining to the judge:

> [I]t's a lot of issues . . . and judge[,] you know point blank it's not a very strong case for the defense, my client admitted in a statement, was extremely remorseful and there's absolutely issues with depression, issues with being . . . misdiagnosed, issues with . . . emotional and sexual abuse that she's endured. So I'm doing everything I can . . . to . . . mitigate things. My client has been nothing but cooperative, did something wrong, but at that point, you know to these types of cases, someone is entitled to some type of mitigation, I think she is a prime candidate, I can't do much more than that then leave it in the prosecutor's hands and then make my best attempts at sentencing

---

[4]  Both J.G. and defendant are intellectually disabled.

[5]  The transcript of the status conference was not provided in the record. However, the PCR judge quoted verbatim from the transcript.

4

> . . . to do the best I can and my client gets help. She's not mean, she's not violent . . . she doesn't cause any problems.

Defendant subsequently agreed to plead guilty to count two pursuant to a plea agreement. At the plea hearing, the prosecutor commented that his review of defendant's medical records did not "change the State's position with regard to the plea offer in th[e] case." During the plea colloquy, defendant averred she understood the plea agreement, was not being forced to plead guilty, and was "pleading guilty freely and voluntarily."

At sentencing, defense counsel urged the judge to sentence defendant at "the bottom of the [second-degree sentencing] range" based on defendant's "mental health issues" as referenced in "different reports," as well as the fact that she had no prior criminal history. In imposing sentence, the judge found aggravating factors three and nine outweighed mitigating factor seven. See N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that the defendant will commit another offense"); N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law"); N.J.S.A. 2C:44-1(b)(7) ("[t]he defendant has no history of prior delinquency or criminal activity").

In addressing defendant's cognitive deficits, the sentencing judge stated:

> I recognize that [defendant] has been diagnosed with some cognitive problems, and she had a difficult

5

childhood . . . . [S]he was sexually abused as a child and I have sympathy for that.

. . . .

. . . And while I recognize she has cognitive problems and suffers from some mental health problems, probably a lot of it emanating from what she experienced as a child, but she was a functioning adult. She was married. She had a job. She has a high school certificate. So, she was living what seemed to be a normal life, but obviously she had this horrible past experience.

The judge found defendant's sympathetic background did not "change how wrong her adult behavior was."

Defendant did not appeal her conviction or sentence but filed a timely self-represented PCR petition which was later supplemented by assigned counsel. In her petition, defendant asserted her trial attorney rendered ineffective assistance of counsel (IAC) by failing to: (1) challenge J.G.'s statement to police as unreliable and the product of suggestive and coercive police questioning; (2) obtain her mental health records to move to suppress her statement to police based on her intellectual disability; and (3) argue at sentencing for mitigating factor four based on her disability, see N.J.S.A. 2C:44-1(b)(4).

In a supplemental certification, defendant averred:

Each time I spoke to [trial counsel,] I told him that I was innocent of the charges and I asked him what he

6

A-1713-24

was doing to help me. He would answer that he was speaking to the [p]rosecutor about getting a better plea offer.

. . . I told [trial counsel] that I was on [S]ocial [S]ecurity disability and that I had a case manager with the State of New Jersey. So far as I know, [trial counsel] never obtained my records or did any investigation on my case.

. . . . I told [trial counsel] that I felt pressured and intimidated when the police questioned me and that I did not understand my rights. [Trial counsel] did not show me the video of my statement to the police. So far as I know, [trial counsel] never filed a motion to suppress my statement to the police.

. . . I went to court . . . and was told that I had to either plead guilty or go to trial and face decades in prison. [Trial counsel] told me I should plead guilty. It was clear that [trial counsel] had not done anything to help me or my case and I felt I had no choice at that point but to plead guilty to a crime I did not commit.

To support her claim that counsel was ineffective by failing to challenge J.G.'s forensic interview, defendant retained Nicole Columbino, Ph.D., a licensed clinical psychologist, who opined that the interview was "unduly suggestive" due to the age of the victim, the questioning methodology, the misuse of anatomical diagrams and dolls, the length and time of day the interview was conducted, the five- to six-month delay between the victim's initial disclosure and the forensic interview, and the fact that the victim was

7

diagnosed with a learning disability. Columbino questioned J.G.'s revelation because he initially "did not provide a disclosure supportive of [defendant] sexually abusing him until he was repeatedly questioned by the detective using close-ended questions." Columbino added J.G. "provided inconsistencies throughout the interview." Columbino also believed Ayala "violated numerous best practice interviewing standards."

To support her claim that counsel was ineffective by failing to challenge her statement to police, defendant retained Matthew B. Johnson, Ph.D., a psychologist, who questioned "the reliability of her statement" after conducting a psychological examination of defendant. Johnson found defendant's IQ and other functional capacities suggested an overall diagnosis of mild intellectual disability. He explained the diagnosis interferes with one's "capacity to understand and exercise their rights," particularly Miranda rights, and posited that persons with intellectual disabilities "face heightened risks of falsely confessing in the context of police interrogations."

Following oral argument, the PCR judge entered an order denying defendant's petition. In an accompanying written decision, the judge recounted the facts and procedural history of the case, applied the governing legal

principles, and concluded defendant failed to establish a prima facie case of IAC to justify a hearing or other relief.

Specifically, in rejecting defendant's claim that counsel was ineffective by failing to challenge J.G.'s forensic interview, the judge reviewed Columbino's report and J.G.'s forensic interview. The judge analyzed the decisional law governing "N.J.R.E. 803(c)(27), also known as the 'tender years' exception," which "allows the admission of a statement made by a child under the age of twelve 'relating to sexual misconduct,'" and concluded the "interview was appropriately conducted."

The judge explained:

> Obtaining a disclosure from a young child, who would obviously be uncomfortable with a stranger in a strange environment is far from a facile task. The child initially appeared reluctant and expressed some hesitancy in revealing the intimate encounter he had with [defendant], which might be expected under the circumstances. But after some time, which I don't find inordinately long, the child developed a rapport with the examiner and became more open and responsive. Appropriate anatomical dolls were used to allow the child to demonstrate the physical acts that occurred between him and [defendant]. Notwithstanding J.G.'s age and learning disability, it was evident to me that his description of the acts engaged in by [defendant] were highly credible. A child of his age wouldn't necessarily imagine or contrive the sex acts he described unless he

9

had experienced them himself.[6]  J.G. had no motive to implicate [defendant] in any wrongdoing and Ayala provided no direction or incentive for J.G. to do so.

Addressing defense counsel's decision to not file a motion challenging J.G.'s forensic interview and any resulting prejudice from his failure to do so, the judge commented:

> Trial attorneys must make calculated risks.  What is the likelihood of success in pursuing a course of action–in filing a motion?  Had [defense counsel] retained a similar expert, the criminal defense risked a trial judge arriving at the same opinion I came to after viewing the forensic interview.  In that event, the State's plea offer would have escalated and [defendant] would have found herself in a worse position, facing a much longer prison sentence.[7]  And even if the trial court had found the testimony from a psychologist

6  See State v. D.R., 214 N.J. Super. 278, 298 (App. Div. 1986), rev'd on other grounds, 109 N.J. 348 (1988) (noting one fact militating in favor of reliability of an out-of-court statement relating to child sexual abuse is "the child's exhibiting knowledge of sexual practices beyond [his or] her reasonably anticipated imagination").

7  Under the Jessica Lunsford Act, in count one, defendant was exposed to a specific term of twenty-five years to life in prison, with a minimum period of parole ineligibility of twenty-five years.  N.J.S.A. 2C:14-2(a), (d).  Moreover, under Attorney General Directive No. 2016-6, County Prosecutor's Offices are required to "implement and strictly enforce an escalating plea policy" where "plea offers become tougher over time" and "generally provide for a longer sentence if the defendant" does not "accept responsibility in a timely fashion." Off. of the Att'y Gen., Law Enf't Directive No. 2016-6, Amended Directive Establishing Interim Policies, Practices, and Procedures to Implement Criminal Justice Reform Pursuant to P.L. 2014, c. 31, at 73 (rev. May 24, 2017).

persuasive, the State retained evidence of other disclosures the victim made to others. Frankly, the disclosure to [the therapist] in a clinical setting after it was observed that J.G. was sexually acting out would not only likely have been admissible, but highly compelling to a jury.[8]

The judge similarly concluded defendant "fail[ed] to present a prima facie case" for PCR based on her argument her "counsel was ineffective by failing to obtain her medical records" to show "she had been diagnosed with 'mild mental retardation' with a full-scale IQ of 55," and could not have voluntarily waived her <u>Miranda</u> rights or given a voluntary statement to police. The judge noted defendant's allegation her attorney failed to obtain her records was belied by the record which clearly showed counsel provided the records to the prosecutor and the sentencing judge to negotiate a more favorable plea agreement and mitigate the ultimate sentence imposed.

The judge elaborated:

> In pursuing this strategy, trial counsel obtained . . . an agreement to limit [defendant]'s exposure to a second-degree crime and . . . to use [defendant]'s mental health records and her . . . past difficult experiences as mitigation to convince the sentencing court to limit

---

8 <u>See</u> <u>State v. J.G.</u>, 261 N.J. Super. 409, 421 (App. Div. 1993) (finding a child's "statements made to the family's pediatrician . . . to be trustworthy because they were made 'under clinical conditions,' they disclosed a sexual knowledge beyond the ken of a young child, and they were corroborated by defendant's confessions").

[defendant]'s exposure to the bottom of the second-degree range.

The judge further noted even if "trial counsel abandoned this strategy and moved to suppress [defendant]'s statement to police, [defendant]'s motion was unlikely to succeed." In reaching his conclusion, the judge reviewed defendant's videotaped statement and Johnson's report. After applying federal and state jurisprudence in evaluating the voluntariness of defendant's waiver and custodial statement, the judge reasoned:

> In the present case, while . . . [defendant] has an [IQ] of 55,[9] she does have a high school education, had worked for many years in childcare prior to this crime, and was married to the victim's father at the time of the crime. She was leading a normal life[,] as the sentencing judge noted. A review of her videotaped confession reveals a thoughtful and relatively articulate individual. She gave clear indication that she understood her Miranda rights as she read along each warning with Ayala and initialed each. The conversation between the two began casually. Her responses were appropriate. It appears she generally understood Ayala's questions. And when she didn't, she asked for clarification. At points she contradicted Ayala. She even alleged at one point that the victim inappropriately touched her. When Ayala explored that with her, she became hesitant, realizing some of her contradictions. Before finally admitting her criminal

---

[9] See State v. Carpenter, 268 N.J. Super. 378, 385 (App. Div. 1993) ("A defendant's [IQ] is merely a factor in the totality of the circumstances to be considered" in evaluating "whether he [or she] understood the meaning of the Miranda warnings.").

conduct, she paused, appearing conflicted and deep in thought. Then, in what appeared to be an effort to clear her conscience, she admitted to her criminal acts, describing in some detail the circumstance and the interactions between her and J.G. She described where the assault occurred, how it happened, how many times it occurred, and where the child's father was located during her unlawful interactions with J.G. She may have been frightened and felt some compulsion to make her admissions as a result of the effective interviewing techniques employed by an experienced investigator. But that didn't make her waiver of her <u>Miranda</u> rights or her statement any less knowing or voluntary.

The judge added:

While Johnson's report explained the effect an intellectual disability may have on a person undergoing examination in a police setting, he does not necessarily explain how [defendant's] disability specifically made her waiver and statement ineffective or unreliable. The finding of a mild intellectual disability as detailed in Johnson's report would not likely have led to a court suppressing [defendant's] statement. So, the decision to take advantage of the plea offer and not risk exposing [defendant] to more prison time by pursuing a[n] arguably fruitless suppression motion appeared to be a reasonable and appropriate legal strategy.

Likewise, the judge rejected defendant's argument "her trial counsel was constitutionally ineffective for failing to present . . . evidence at sentencing" of mitigating factor four, N.J.S.A. 2C:44-1(b)(4). The judge pointed out the "sentencing transcript demonstrate[d] . . . the sentencing court was made aware of [defendant]'s cognitive problems and considered them at sentencing," but "did

13

not deem those facts sufficient to warrant a finding of [mitigating] factor [four]."

Thus, the PCR judge concluded defendant failed to establish a prima facie case of IAC on any basis. This appeal followed.

On appeal, defendant reprises the arguments rejected by the PCR judge as follows:

> POINT I
>
> THIS COURT SHOULD REVERSE THE PCR COURT'S DECISION TO DENY THE DEFENDANT'S PETITION FOR [PCR] WITHOUT AN EVIDENTIARY HEARING BECAUSE . . . DEFENDANT ESTABLISHED A PRIMA FACIE CLAIM THAT HER PLEA COUNSEL WAS INEFFECTIVE FOR FAILING TO CONTEST THE ADMISSIBILITY OF J.G.'S STATEMENT.
>
> POINT II
>
> THIS COURT SHOULD REVERSE THE PCR COURT'S DECISION TO DENY THE DEFENDANT'S PETITION FOR [PCR] WITHOUT AN EVIDENTIARY HEARING BECAUSE . . . DEFENDANT ESTABLISHED A PRIMA FACIE CLAIM THAT HER PLEA COUNSEL WAS INEFFECTIVE FOR FAILING TO OBTAIN MEDICAL RECORDS AND AN EXPERT WITNESS WHO COULD CHALLENGE THE ADMISSIBILITY OF HER STATEMENT TO THE POLICE.
>
> POINT III
>
> THIS COURT SHOULD REVERSE THE PCR COURT'S DECISION TO DENY THE

DEFENDANT'S PETITION FOR [PCR] WITHOUT AN EVIDENTIARY HEARING BECAUSE . . . DEFENDANT ESTABLISHED A PRIMA FACIE CLAIM THAT HER PLEA COUNSEL WAS INEFFECTIVE FOR FAILING TO OBTAIN MEDICAL RECORDS AND AN EXPERT WITNESS WHO COULD CHALLENGE THE VOLUNTARINESS AND RELIABILITY OF HER ADMISSIONS TO THE POLICE.

POINT IV

THIS COURT SHOULD REVERSE THE PCR COURT'S DECISION TO DENY THE DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING ON THE ISSUE OF WHETHER . . . DEFENDANT'S ATTORNEY WAS INEFFECTIVE AT SENTENCING.

## II.

We begin by setting out the guideposts that inform our review. "We review the legal conclusions of a PCR judge de novo," State v. Reevey, 417 N.J. Super. 134, 146 (App. Div. 2010), but "review under the abuse of discretion standard the PCR court's determination to proceed without an evidentiary hearing," State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013). "[W]here . . . no evidentiary hearing was conducted," as here, "we may review the factual inferences the [trial] court has drawn from the documentary record de novo." State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016) (citing State v. Harris, 181 N.J. 391, 420-21 (2004)).

An evidentiary hearing is only required when (1) a defendant establishes "a prima facie case in support of [PCR]," (2) the court determines that there are "material issues of disputed fact that cannot be resolved by reference to the existing record," and (3) the court determines that "an evidentiary hearing is necessary to resolve the claims" asserted. State v. Porter, 216 N.J. 343, 354 (2013) (alteration in original) (quoting R. 3:22-10(b)); see also R. 3:22-10(e)(2) (providing "[a] court shall not grant an evidentiary hearing . . . if the defendant's allegations are too vague, conclusory[,] or speculative").

Indeed, "[i]f the court perceives that holding an evidentiary hearing will not aid the court's analysis of whether the defendant is entitled to [PCR], . . . then an evidentiary hearing need not be granted." Brewster, 429 N.J. Super. at 401 (omission in original) (quoting State v. Marshall, 148 N.J. 89, 158 (1997)); see also State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (explaining the mere raising of a claim for PCR does not entitle the defendant to an evidentiary hearing and the defendant "must do more than make bald assertions").

"To establish a prima facie case, [a] defendant must demonstrate a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits." R. 3:22-

10(b). Moreover, a defendant must make this showing "by a preponderance of the credible evidence." State v. Goodwin, 173 N.J. 583, 593 (2002).

Rule 3:22-2 recognizes five cognizable grounds for PCR, including a "[s]ubstantial denial in the conviction proceedings of [a] defendant's [constitutional] rights," R. 3:22-2(a), which encompasses the Sixth Amendment right to the effective assistance of counsel at issue in this appeal, State v. Nash, 212 N.J. 518, 541-42 (2013). To establish a prima facie claim of IAC as contemplated under Rule 3:22-2(a), a defendant must demonstrate that the performance of counsel fell below the objective standard of reasonableness set forth in Strickland v. Washington, 466 U.S. 668, 687-88 (1984), and adopted in State v. Fritz, 105 N.J. 42, 49-58 (1987), and that the outcome would have been different without the purported deficient performance. Nash, 212 N.J. at 541-42. Stated differently, a defendant must show: "(1) 'counsel's performance was deficient'; and (2) 'the deficient performance prejudiced the defense.'" State v. Vanness, 474 N.J. Super. 609, 623 (App. Div. 2023) (quoting Strickland, 466 U.S. at 687).

To satisfy the first prong, a defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment" and "that counsel's representation

fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. "[I]n making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. As such, a defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

In that regard, "[i]f counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is 'virtually unchalleng[e]able.'" State v. Savage, 120 N.J. 594, 617 (1990) (quoting Strickland, 466 U.S. at 690-91). On the other hand, IAC may be established "when counsel fails to conduct an adequate pre-trial investigation." State v. Porter, 216 N.J. 343, 352 (2013). "[F]ailure to present mitigating evidence or argue for mitigating factors" at sentencing, "even within the confines of [a] plea agreement," may also support a claim of IAC. State v. Hess, 207 N.J. 123, 154 (2011). However, "[i]t is not [IAC] for defense counsel not to file a meritless motion," State v. O'Neal, 190 N.J. 601, 619 (2007), or fail "to raise unsuccessful legal arguments," State v. Worlock, 117 N.J. 596, 625 (1990).

Still, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. For that reason, "[t]he quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006). "The test is not whether defense counsel could have done better, but whether he [or she] met the constitutional threshold for effectiveness." Nash, 212 N.J. at 543.

To satisfy the second Strickland/Fritz prong, "[t]he error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694). This prong generally requires that a defendant establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "That 'is an exacting standard.'" State v. Gideon, 244 N.J. 538, 551 (2021) (quoting State v. Allegro, 193 N.J. 352, 367 (2008)).

To establish the prejudice prong in the context of a guilty plea, a defendant must show "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial." State v. DiFrisco, 137 N.J. 434, 457 (1994) (alteration in original) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). To that end, "a [defendant] must convince the court that a decision to reject the plea bargain" and "insist on going to trial" would have been "rational under the circumstances." State v. Maldon, 422 N.J. Super. 475, 486 (App. Div. 2011) (quoting Padilla v. Kentucky, 559 U.S. 356, 372 (2010)). That determination should be "based on evidence, not speculation," ibid., and "[s]olemn declarations in open court carry a strong presumption of verity," State v. Simon, 161 N.J. 416, 444 (1999) (alteration in original) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Failure to meet either prong of the two-pronged Strickland/Fritz test results in the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012) (citing Echols, 199 N.J. at 358). That said, "courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." State v. Gaitan, 209 N.J. 339, 350 (2012) (citation omitted) (citing Strickland, 466 U.S. at 697).

Applying these principles, we agree with Judge Paone that defendant failed to establish a prima facie IAC claim, entitling her to relief or an evidentiary hearing, and we affirm substantially for the sound reasons articulated by the judge in his written decision. Focusing on the prejudice prong of the Strickland/Fritz test as we are permitted to do, defendant has not even averred that but for counsel's perceived errors, she would "not have pled guilty and would have insisted on going to trial." DiFrisco, 137 N.J. at 457 (quoting Hill, 474 U.S. at 59). On the contrary, during the plea colloquy, defendant averred she was "pleading guilty freely and voluntarily." Nor has defendant shown by competent evidence that "a decision to reject the plea bargain would have been rational under the circumstances," particularly given her lengthy sentencing exposure and the State's compelling evidence of guilt. State v. O'Donnell, 435 N.J. Super. 351, 371 (App. Div. 2014) (quoting Padilla, 559 U.S. at 372).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1713-24